## THE CITY OF NORWICH.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

No. 119.

1. Admiralty ⬦117—Appeal removes cause for trial de novo.

An appeal in admiralty from the District Court to the Circuit Court of Appeals vacates the decree of the District Court and removes the cause to the appellate court for trial de novo.

2. Seamen ⬦3—Contract governed by law of ship's flag.

The contract of natives of India, who signed in that country as seamen on a British ship, is governed by British law.

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Seamen ⊚⟹10—Insufficient food justifies leaving ship.**

Under both British and American law, seamen who are supplied with insufficient food are justified in leaving the ship before completion of the voyage for which they signed, and are entitled to recover full wages for the time served.

**4. Seamen ⊚⟹26—Evidence held not to justify seamen in leaving their ship.**

Testimony of a seaman that he was struck with a hammer by an engineer, which was contradicted by the engineer, *held* not to justify such seaman, and, a fortiori, other members of the crew, in leaving the ship.

**5. Seamen ⊚⟹26—Evidence held to show desertion by seamen, by which, under British law, they forfeited their wages.**

.Evidence *held* not to sustain an allegation that seamen were forced to leave their ship and forbidden to return, but to show that they left voluntarily, without sufficient cause, and refused to return, by which, under British law, they forfeited their claims to wages.

**6. Seamen ⊚⟹16—Must perform contract, or have valid excuse, to be entitled to wages.**

That a seaman may recover wages it must appear, not only that there was a valid contract of employment, but that he performed his contract until the voyage was completed, or his term of service expired, or some legal and sufficient excuse must be shown for nonperformance.

**7. Seamen ⊚⟹26—Burden of proving desertion rests on ship.**

The burden of proving desertion as a defense to a claim for wages always rests on the owner of the ship.

**8. Seamen ⊚⟹34—"Desertion" defined.**

Desertion by a seaman consists in his abandonment of duty by quitting the ship before the termination of his engagement, without justification, and with the intention of not returning.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Desertion (in Maritime Law).]

Appeal from the District Court of the United States for the Eastern District of New York.

Suit in admiralty by Fazel Ahammed and others against the steamship City of Norwich; Norton, Lilly & Company, claimant. Decree for libelants, and claimant appeals. Reversed.

For opinion below, see 274 Fed. 374.

This is an appeal by the claimants of the steamship City of Norwich from a final decree awarding to the libelants for wages, maintenance, and transportation an amount which aggregates $20,235.28. The libelants are 33 seamen, who were employed as firemen on the steamship, and who seek to recover wages and penalties under section 4529 of the Revised Statutes of the United States (Comp. St. § 8320). The libelants filed a libel against the steamship, which is a British freight steamer, and it was attached and taken into the custody of the United States marshal at its dock in Brooklyn. An approved stipulation for value was entered into pursuant to the rules and practice of the court, and the agreed value for the purpose of bonding in this suit was fixed at the sum of $15,000.

It is alleged in the libel that the libelants signed shipping articles on December 6, 1920, at Bombay, India, for a voyage to ports of the United States and other ports, for a period not exceeding 12 months, and that they were to be paid off at a port in India. It is also alleged that, while the steamship was lying at the Bush Terminal in the port of New York, "without cargo and without prospect of cargo," the libelants were "driven ashore by force at arms by the captain and officers of the ship and were beaten and threatened." The libelants also alleged "that they have been compelled to sleep on the dock adjoining said vessel for two or three days without food; that they have now

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

been given temporary lodging and credit, but are waiting destitute, without any funds, until this action can be brought to trial." Claim was made for their wages already earned and two days' pay, board, and lodging for every day their wages were withheld, under section 4529 of the Revised Statutes of the United States, and a further claim of damages in the sum of $250 each for the pain and suffering, and personal inconvenience and mental and physical anguish, they have suffered by being unlawfully forced ashore, and by being deprived of food and lodging. They alleged that their claims totalled approximately $17,320.

The answer denied certain material allegations of the libel. It alleged that the contract signed by libelants was a British contract, governed by British law, and that, since all the matters complained of in the libel related to internal management of a British ship, the dispute should be left to the British consul at the port of New York in accordance with international comity.

The court filed its opinion on May 25, 1921, and dismissed the libel. The case was reopened at the next term, and set for further hearing on June 11, 1921, over the claimant's objection, and libelants were permitted to file an amended libel in open court. The amended libel alleged that on April 4, 1921, while the vessel was lying at Bush Terminal, without cargo and without prospect of cargo, libelants "were driven ashore (or prevented from returning on board) by force at arms by the captain and officers of the ship, and were beaten and threatened when they returned to the ship from making a complaint to the consul and agents of the company concerning the grub and other conditions on board ship on said date."

It was further alleged that, under British law, "when the voyage is delayed and not proceeded with, seamen are entitled to their wages earned to date and to wages for such further period together with such expenses as will enable them to reach the port of departure and the port where it was contemplated by the contract the voyage should end." Also: "That scanty provisions and insufficient food is excuse for breach of contract by the seamen," and "deviation from a voyage by the master of the ship is a breach of contract under English law as under the American law. A seaman, discharged wrongfully after signing articles and before the commencement of a voyage, was entitled to wages for the full voyage which had been contemplated." Also: "That it is contrary to the policy of British courts and British law to discharge native seamen in foreign ports." It was further alleged that under British law "a seaman is entitled as a matter of right to go ashore to make complaint of bad treatment or insufficient food, to the British consul at any port."

Owing to the fact that the amended libel was filed in open court, the claimant did not answer it. After the case was opened, and the amended libel was filed, a considerable colloquy ensued between counsel as to what the exact issue was. Finally an agreement was reached on that subject as appears from the following excerpts from the record:

"Mr. Axtell: The one issue in this case is: Did the master and officers of this ship prevent these men from resuming their employment on the ship, and continuing the voyage, and were these men deserters in accordance with the law, whatever law the court applies?

"Mr. Jones: I think we are entitled to know, by a formal pleading, just what the libelant's claim is.

"Mr. Axtell: I pleaded generally what the law of England is on this general topic of contracts between master and seamen. It is well understood that the seamen forfeits his wages if he deserts the ship.

"The Court: Is there any suggestion that there is anything in this case except what transpired after the boat reached Brooklyn?

"Mr. Axtell: No; it was not pleaded.

"The Court: With the understanding that we are limited to events which occurred after the boat got to Brooklyn, we may go ahead with the British law."

279 F.—44

Kirlin, Woolsey, Campell, Hickox & Keating (Vernon S. Jones and L. De Grove Potter, both of New York City, and Raymond Parmer, of Brooklyn, N. Y., of counsel), for appellant.

Silas B. Axtell, of New York City, for appellees.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The opinions of the court below may be found in 273 Fed. 304, and in 274 Fed. 374. There are 22 assignments of error. The first of these is that the court found that the libelants were wrongfully discharged, whereas they were in fact deserters. A number of the other errors assigned are serious and among them are:

That the court, having rendered an opinion dismissing the libel on May 25, 1921, allowed the libelants at the June term to reopen the case on June 8th to file an amended libel and to introduce further testimony, and that the court was without power over its decree after the term in which it was entered. That the court held that two of the libelants were wrongfully discharged from the vessel, although they were sick in the hospital on the date of the alleged discharge. The captain had previously paid the wages due to these two men to the British vice consul and they had been discharged because of their incapacity arising from illness. Nevertheless the wages of these two men are included in the amount of the decree. That the court entered a decree against the stipulators and against the vessel in the sum of $20,235.28, although the stipulation for value was in the sum of $15,000. And that a decree cannot be entered against a stipulator for more than the amount of the bond which he gives, whether he be a claimant or not. That the court granted to each libelant, in addition to his wages, the sum of $350 for transportation back to India, although no proof was submitted at any time of the cost of transportation to India, and the amount was fixed by the court on a statement made in the libelants' notice of settling the final decree. This item alone amounted to $11,550.

If the court erred in finding that the libelants were wrongfully discharged, and should have found that they deserted, it will not be necessary to consider any other assignment of error.

[1] In considering this case we shall proceed upon the principle that an appeal in admiralty is a trial de novo. It is the law of this circuit that in admiralty an appeal by either party operates to remove the case to this court for a trial de novo. Munson S. S. Line v. Miramar S. S. Co., 167 Fed. 960, 93 C. C. A. 360; Andersen v. Steamship Kalfarli, 277 Fed. 391, decided at this session, but not yet reported. And such doctrine is justified by the similar rulings of the Supreme Court. In Irvine v. The Hesper, 122 U. S. 256, 7 Sup. Ct. 1177, 30 L. Ed. 1175, Mr. Justice Blatchford, speaking for the court, said:

"It is well settled, however, that an appeal in admiralty from the District Court to the Circuit Court vacates altogether the decree of the District Court, and that the case is tried de novo in the Circuit Court. Yeaton v. United States, 5 Cranch, 281; Anonymous, 1 Gallison, 22; The Roarer, 1 Blatchford, 1; The Saratoga v. 438 Bales of Cotton, 1 Woods, 75; The Lucille, 19 Wall, 73; The Charles Morgan, 115 U. S. 69, 75."

In the Reid Case, 241 U. S. 544, 36 Sup. Ct. 712, 60 L. Ed. 1156, the court was asked to repudiate the doctrine announced in the Irvine Case, but instead it reaffirmed the ruling. And in The John Twohy, 255 U. S. 77, 80, 41 Sup. Ct. 251, 252 (65 L. Ed. 511) that court again adheres to the Irvine Case and says that it is "the settled law as to the effect of appeals in admiralty." In the Kalfarli Case, supra, we examined at some length the right of this court to weigh the evidence in the record for ourselves, and to disregard in proper cases the findings of fact by the court below. It is not necessary to repeat what we there said. We are not to be concluded by the findings below, when we think they are clearly against the weight of the testimony.

[2] The libelants are Punjabs, and they became members of the crew and signed the ship's articles in Calcutta, except two or three who joined the crew at Bombay, in India. The British law alone is therefore applicable to this suit. This court, in Ole Tolo v. Hanna Nielsen (C. C. A.) 273 Fed. 171, held that contract cases are governed by the law of the ship's flag. This was in accordance with what was said by the Supreme Court in Belgenland, 114 U. S. 367, 5 Sup. Ct. 865, 29 L. Ed. 152, that—

"Whoever engages voluntarily to serve on board a foreign ship necessarily undertakes to be bound by the law of the country to which such ship belongs."

On the trial, formal proof of British law was waived. The attention of the court was called to the British Merchants Shipping Act of 1894. Section 211, of article 1, of that act reads as follows:

"If a seaman or apprentice who is on board ship has desire to make a complaint to a justice of the peace, British consul officer, or officer in charge of one of her majesty's ships, against the master or any of the crew, the master shall, so soon as the services of the ship will permit  *  *  *  allow the complainant to go ashore or send him ashore in proper custody." etc.

And section 221 reads as follows:

"If a seaman lawfully engaged, or an apprentice to the sea service, commits any of the following offenses he shall be liable to be punished summarily as follows:

"(a) If he deserts from his ship he shall be guilty of the offense of desertion and be liable to forfeit all or any part of the effects he leaves on board, and of the wages which he has then earned, and also, if the desertion takes place abroad, of the wages he may earn, in any other ship in which he may be employed until his next return to the United Kingdom, and to satisfy any excess of wages paid by the master or owner of the ship to any substitute engaged in his place at a higher rate of wages than the rate stipulated to be paid to him; and also, except in the United Kingdom, he shall be liable to imprisonment for any period not exceeding twelve weeks with or without hard labor."

[3] Before proceeding further in the consideration of the case, we may refer to a subject upon which there appears to be as much, if not more, testimony in the record than on any other single phase of the subject. The matter referred to is that relating to the provisions furnished the seamen and the complaints made by them respecting the food.

Want of provisions will justify seamen in leaving the ship. They must be supplied with food so long as they remain on board under

their contract and are willing to do their duty. If they are not so supplied, the men, under British law, as Lord Stowell said in The Castilia, 1 Hagg. 356, "are justified in departing." And see Abbott on Shipping (12th Ed.) p. 132. Maclachlan's Law of Merchant Shipping, 268, 269.

In that matter the British law is like our own. Our courts have held in numerous cases that, if seamen are supplied with insufficient food, they are justified in leaving the ship before the completion of the voyage for which they signed, and are entitled to recover full wages for the time they served. The Balize, 2 Fed. Cas. p. 547, No. 809; The Happy Return, 23 Fed. Cas. p. 560, No. 13,697; The Amalia (D. C.) 3 Fed. 652, 660; The Forteviot (D. C.) 98 Fed. 440. So important is this obligation that the British Merchant Shipping Act of 1894 obliges the master of the ship to specify in his contract with his crew the description and quantity of provisions and water to be furnished, and he must furnish them with the means of weighing and measuring the articles so furnished.

It is not necessary for us to review the testimony on the subject, in view of the admission on the record at the trial by the libelant's counsel that there is nothing in the case except what transpired after the boat reached Brooklyn. The libel as amended, like the original libel, contains no allegation that the men left the ship because of the failure to supply them with suitable provisions. Indeed, it does not allege that they left the ship for any reason. On the contrary, it is framed upon the sole theory that the libelants were driven from the ship and prevented from returning by the captain and the officers of the ship. We may say, however, in passing, that in our opinion the evidence shows beyond question that no reason existed for any complaint concerning the food furnished to the men. It was sufficient in quality and in quantity. The evidence to that effect is abundant and overwhelming.

[4] It appears, too, that one of the crew had some difficulty with the fifth engineer on the morning of April 4th. There is conflicting testimony as to what happened at that time. This engineer testified that he charged one of these men with having taken a hammer which belonged to him, and that the man swore at him, and that he told him not to swear at him, and gave him a push, and that he did not strike him at all; but that the man he had pushed shouted that he had been hit and thereupon the men left the ship. The seaman testified that the engineer hit him with the hammer; but the record fails to disclose that any person saw the engineer strike the man.

If the man was in fact struck as he claimed, it would not, under our law, justify all the libelants in leaving the ship, and no such claim was advanced at the argument. It has been held, in this country, that a seaman is justified in leaving a vessel through fear, induced by cruel treatment and threats. Bush v. The Alonzo, Fed. Cas. No. 2,223; Sherwood v. McIntosh, Fed. Cas. No. 12,778; Magee v. The Moss, Fed. Cas. No. 8,944; Coffin v. Weld, Fed. Cas. No. 2,953. But it has been held that a single act of assault and battery, though exceeding the bounds of moderation, will not justify a desertion, unless there be reasonable ground for apprehending that the acts of oppression will be repeated. Steele v. Thacher, Fed. Cas. No. 13,348. And we think that

upon the unconvincing testimony in this record the particular member of this crew who claims he was hit, under the circumstances above detailed, was not justified in his desertion of the ship, and a fortiori the other members of the crew had no such right under our law. If the British law on this subject differs from our own, it has not been shown nor our attention directed to it. Moreover, neither the libel as originally drawn, nor the amended libel, alleged that the men left the ship because of any cruel treatment or alleged assault, and there is no allusion to the subject. On the contrary, it is alleged that the men were ready to complete their contract of employment by returning on board the vessel and continuing the voyage to Bombay in accordance with the terms of their agreement.

[5] This brings us to the real question at issue, which is whether these libelants were forced to leave the ship, or whether they left it voluntarily and without justification, and are in fact deserters. It appears that on April 4th the men went to the office of the agents of the steamship, and the manager of one of the departments testified that he talked with them to find out what the trouble was, and they told him that one of their number had been hit on the arm by one of the engineers and that they had left the ship. He testified:

"I told them that I was sorry to hear that the engineer had struck one of them; that he didn't have any business to do it, and told them to go back on the ship, and that I would come down to the ship myself and investigate conditions down there and have them straightened out; any objections that they had to make, that they would be able to tell me all about them, and that they would be gone into thoroughly and straightened out. They refused to go back to the ship.

"Q. What did they say? A. They said they would not go over to the ship under any circumstances. Then I suggested that, if they were not satisfied to leave the matter in my hands or in the captain's hands, they should go down to the consul's, and that I would arrange to have the consul send a man down to investigate and straighten the matter out. No; they said they would not go to the consul. So I simply told them there was nothing further that I could do. I didn't have any authority.

"Q. Did you see the captain of the vessel down at your office that day? A. Yes; the captain came in while this was going on, and I suggested to him—I told him what had passed, and he told the men to go back to the ship, and that we would come down and straighten it out. They refused to go back to the ship.

"Q. Did they say that? A. Yes; they refused to go back to the ship.

"Q. Did anything further take place before the captain? A. He simply talked to them, and tried to get them to go back; but they would not.

"Q. Did any of them complain, either to you or in your hearing to the captain, that they had been forced off the ship on that day? A. No; as a matter of fact, they told me, they said they had left the ship in a body after this man had been struck on the arm by the engineer."

He was asked whether the men had complained that they had been forced to leave the ship, and he said they had not. The next day they appeared at the office of the British consul. The claimant's testimony is that the libelants never thereafter returned to the ship, with the exception of Fazel Ahammed, the serang, who returned on Wednesday morning, April 6th, with three or four colibelants, to aid him in removing his luggage.

The claims of the libelants as to the cause of their leaving on April 4, 1921, are inconsistent and confused. Both the libel and amended

1.bel allege, as we have seen, that they were driven off the ship on that day. Their testimony, however, fails to support this allegation. Some of them state that the chief engineer and chief officer told them that, if they went to the consul's office, they could take their baggage with them. This is not only denied by the ship's officers, but is also indirectly denied by other disinterested witnesses, including the British consul, who testified that, although the men stated their complaints to him, they never once complained that they had been ordered or driven off the ship. On the contrary, they stated they had left it of their own accord.

When the men, after they left the ship, visited the British consulate, they saw the British vice consul, who was in charge of the Consulate Shipping Office. He testified to some complaint as to the food, and what the men said about one of the men having been hit by a hammer, and that the captain had said to him that he thought the men wanted more wages, and offered them 100 per cent. increase if they would return, but that they said they would not go back to the ship, or to any other British ship. Then followed this testimony:

"By the Court: Q. Did they say why they would not go back to the ship? A. No; they gave no reason.

"By Mr. Jones: Q. During the second conversation, when the master was present, did any of the men say they had been ordered off the ship by any of the officers of the ship? A. Not to my knowledge.

"Q. You didn't hear anything like that? A. No.

"Q. Did you order the men to go back to the ship? A. No; I told them they had better go back to the ship, and take their complaints to the master in the future. They repeated what they had said before, that they would not go back to the ship, or to any other British ship."

From the British consul's office they went immediately to the Seamen's Service Center, where two members of the bar, connected with one of the leading admiralty firms in New York, who had been called there to advise with them, talked with them. One of the attorneys testified that the men stated to him that they had left the vessel, and that he found "that they had left the vessel of their own accord." He continued:

"We advised them that under the circumstances we considered that they were improperly away from the vessel, and that they should go back to the vessel; that otherwise they would be treated as deserters.

"By Mr. Jones: Q. Did either of these men say anything about any officers of the ship ordering them off the vessel with their baggage? A. No.

"Q. Was that one of the complaints they made to you through the interpreter? A. No; that was not the complaint.

"Cross-Examined by Mr. Axtell: Q. Did they want you to tell them what to do, or why you were called in? A. We were called in by the Seamen's Service.

"Q. Your firm is one of the biggest shipowners' attorneys in the city, isn't it? A. I think it is, yes.

"Q. You advised them that they had no rights in the matter, and they had better get back on board the ship? A. That is what I advised them; that is, I advised the Seamen's Service Center in that way.

"Q. And that was communicated to the men through the interpreter? A. Yes."

It is noted that they made no complaint to the witness that they had been ordered off the vessel. But it is said that the men afterwards con-

cluded that they would return to the ship, and that they attempted to do so, and were denied the right to go aboard. This was testified to by a witness by the name of Henderson, who stated that he was of Hindoo origin and an able-bodied seaman. This man had interested himself in the affairs of the libelants, and he claimed that the men finally decided to return to the ship, and that he went along to see that they got on board. His story was that he led the men to the ship after they left the consul's office on April 5th, and that he went up the gangway at the head of 10 men, who were also standing on the gangway, and that the other 21 were trailing immediately behind; that the quartermaster summoned the captain, who came and, pointing a revolver at the men, refused to let them go aboard the ship. The libelants themselves did not wholly corroborate Henderson. They stated that 21 of them remained at the entrance to the inclosed portion of the pier, a considerable distance from the ship, and that only 10 of them went in and approached the gangway. The following excerpt is from his testimony:

"Q. Did you see the captain? A. Yes, sir; and he said: 'I will call the captain.' The captain came out along with the chief engineer, and came right up to me. I was in front, and the Serang was next to me. He had a revolver in his hand, which he said was loaded, and if I didn't move from the gangway he was going to shoot me; but I did move from the gangway because I didn't want to get shot."

He also stated that the captain was not objecting to him personally, but to the men who were with him. We think he appeared to disadvantage on his cross-examination. However, the testimony of Ahammed, one of the libelants, and the leading man among them, was corroborative of his story in part. It was on this point as follows:

"Q. Well, did you get on board the ship? A. We were standing on the gangway, and the quartermaster consulted the captain of the ship, and the captain came with a revolver and drove us off the ship at the point of the revolver. The chief engineer was there also."

There is an issue of fact as to whether the men ever did return to the vessel for duty after leaving the consul's office on April 5, 1921. The great weight of the evidence is they did not do so.

We agree with counsel for the appellants that, if any such extraordinary action on the part of the captain in standing at the head of a gangway and keeping the libelants from coming aboard the ship at the point of a revolver had actually occurred, it certainly would have been mentioned to the proctor for the libelants, and would have been alleged in the original libel. The libel, however, fails to mention it, and this omission is doubly significant, because the witness Henderson testified on cross-examination that he was the man who had the libel verified, and that he read it over and explained it, and interpreted it to all the men, and that he thought the libel was correct.

[6] The libelants seek the recovery of wages and the claims of seamen for wages are highly favored by the courts. The Idlehour (D. C.) 63 Fed. 1018. That a seaman may recover wages it must appear, not only that there was a valid contract of employment, but that he has performed his contract until the voyage was completed, or his term of

service expired, or show some legal and sufficient excuse for nonperformance. O'Neil v. Armstrong [1895] 2 Q. B. 70, affirmed 2 Q. B. 418, 8 Aspin. 63; Lloyd v. Sheen, 10 Aspin. 75; Singstrom v. The Hazard, 22 Fed. Cas. p. 224, No. 12,905; The Leiderhorn (D. C.) 99 Fed. 1001. That the contract of employment in this case was valid is not questioned. The defense to the suit is that the men failed to perform their part of the agreement and deserted.

The captain testified positively that, after the men left the ship and visited the consulate, they never again reported for work on the ship, and that he logged them as deserters. His testimony is that not one of them asked him to be permitted to go back to the ship. The following is an excerpt from his testimony:

"Q. At any time after these men whose numbers are on the shipping articles as 31 to 73, after they left the vessel, did any of them ask you to come back on board the vessel again? A. No, sir; not one. * * *

"Q. Did any of them ever come back on the vessel, and ask you to come back? A. No, sir.

"Q. Did you issue any orders to anybody to order them off the vessel? A. At no time—never at any time; never decidedly not. * * *

"Q. Did you ever issue any orders to anybody to stop these men from coming back on board the ship? A. At no time; never.

"Q. Did you ever threaten any of these men with bodily harm? A. No; never thought of such a thing.

"Q. Did you ever hear any of the officers or members of the crew threaten these men? A. No, sir; never at any time; never.

"Q. The libelants have alleged in their libel and by amendment in their testimony, when they returned from making the complaint to the consul and to the agents of the vessel, that they were beaten and threatened by you and by the officers of the ship. What have you to say about that? A. It is a fairy tale; no such thing ever happened, or was ever thought of.

"Q. Did you ever compel these men to sleep on the dock, or any of them? A. No.

"Q. Did you ever tell them they couldn't come back on the vessel and have food? A. No; at no time. * * *

"Q. Did they ask the British consul to permit them to return? A. Never; no; didn't. * * *

"Q. When they left, did you or any of your subordinates order them to take their clothes with them? A. No. If any one had done so, it would have been as much as their job was worth. * * *

"Q. But that was after they had been denied entrance to the vessel? A. They were never denied entrance to the vessel at any time. * * *

"Q. Those who reported the matter to you didn't report to you that the Serang and the men who came around for admission to the vessel had been forced off, did they? A. There was nothing of the sort. Nothing ever mentioned or said or whispered, or anything else about them leaving in that way—forced off."

The chief officer of the ship testified as follows:

"Q. Did anybody stop them? A. No.

"Q. Did you hear anybody threatening them? A. No.

"Q. Did you see anybody beating them up? A. No.

"Q. You didn't beat them up or threaten them, did you? A. No.

"Cross-examination by Mr. Mahon: Q. Was he forced off the vessel, or ordered to leave, by anybody? A. No.

"Q. Were you people anxious to have them on board? A. Yes.

"Q. And let them depart in peace? A. Yes; didn't interfere with them at all in any way.

"Q. You are quite certain nobody on board here forced these men off the second time they returned? A. Quite certain; yes."

The chief engineer of the ship testified as follows:

"Q. Did anybody order them off the vessel on that occasion? A. No.
"Q. They weren't forced off that time, were they? A. No.
"Q. Did you see anybody threatening or beating them? A. No.
"Q. It says in the libel they were driven ashore by force of arms by the captain and the officers of the ship, and were beaten and threatened? A. Absolutely untrue."

The second engineer testified as follows:

"Q. Did you hear anybody order them off the vessel? A. No.
"Q. After they went off, did you tell them they couldn't come back? A. No.
"Q. Or hear anybody tell them that? A. No.
"Q. Did they ever ask you to come back on the vessel? A. No. * * *
"Q. So you couldn't say they weren't forced off the vessel? A. They weren't forced off. We tried to keep them on board. * * *
"Q. Did you see anybody order them ashore or hear? A. No. I said to the Serang, 'You had better stop the men going ashore; they may get into trouble.'
"Q. What did he say? A. He says, 'The men don't want to go on the ship.' "

The third engineer testified as follows:

"Q. At any time while you were on the vessel, did you ever beat up any Punjab? A. I did not.
"Q. Or threaten them? A. I don't think I ever threatened them; most certainly never touched them. * * *
"Q. Did you ever order any of them off the ship in New York? A. No.
"Q. After they left the vessel, did you ever tell them they never could come back? A. No."

The fourth engineer testified as follows:

"Q. Did you see anybody strike the Gillie? A. No.
"Q. Did you hear anybody threaten? A. No.
"Q. Did you ever order any of them off the vessel? A. No.
"Q. Did you ever tell them they couldn't come back? A. No."

The fifth engineer, who is the man who was charged with having struck one of the crew with a hammer, testified as follows:

"Q. Did you ever threaten any of them? A. No. * * *
"Q. Did you ever forbid any one to come back? A. No.
"Q. Did you ever order any of them off the ship? A. No."

A detective by the name of Harper, employed by a detective company, was working at Pier 2, where the ship was lying during the difficulties involved. He was on the gangway at the time when it is claimed the seamen came back to the ship and were ordered off by the captain. He testified as follows:

"Q. You deny that there was any such occurrences as related by these men, of their coming on board that boat, and offering to turn to, and the captain saying he would put them off with a revolver? A. I haven't heard any such thing.
"Q. If I were to inform you that one of these men has stated that you are the man, will you deny it still? A. I was the man that was there, but they didn't show up there."

As to what actually happened, he testified as follows, after stating that none of the crew came up the gangway and that the men involved were all in civilian dress:

"Q. At any time that evening did any body of Hindoos come up the gang-way? A. No.

"Q. Were there any on the dock? A. No; not that I could see. * * *

"Q. What happened? A. The first of these three men was a white man, and acted as spokesman, and the other two appeared to be Hindoos, well dressed. He asked for the captain personally. He said, 'Is the captain on board?' and I said, 'Yes; do you wish to see him?' And he said, 'Yes.' I said, 'Is it on ship's business?' and he said 'Yes,' and I said, 'Follow me, and I will take you to the captain.' I took him up to the captain.

"Q. How far away from the gangway is that? A. Quite a little distance. I went up to the captain's door and opened it, and said, 'Captain, three men wish to see you on business.' Then I came around to the deck, and I no sooner got down there when I heard the captain saying loudly, 'I don't wish to enter into any argument with you. This is no time to come and see me on business. You had better go ashore.' I heard him repeat to the men, 'Go ashore.' They did come down the stairway.

"Q. To the deck of the ship? A. Yes; from the captain's room, and the captain by this time had come out of his room and was looking down on the deck. The men stopped to converse, and the captain again said, 'Go off my ship. I order you to go ashore.' The white man shouted back to the captain, 'Don't speak like that to us. We are not dogs. You are not in England now.' With that the captain came down and confronted these men, and he said, 'Did you hear what I said? I ordered you to go off the ship.' And the white man speaking said, 'Captain, don't speak like that to me again, or I will knock you through the bulkhead.'

"By the Court: Q. Were there no Hindoos on the dock at that time? A. No. But I couldn't see them from the gangway, but there might have been on the dock. When this fellow said, 'I will knock you through the bulkhead,' the captain said, 'You would,' and he went back to his room. And I said, 'You have seen the captain, and have heard what he has to say, and you had better go ashore.' So they did, and the captain came to the head of the gangway and shouted down to these men, 'You would knock me through the bulkhead, would you? I would like to see you come on board and do it now.'"

"By Mr. Jones: Q. When you got back to the gangway, were any of the Hindoos around there? A. No.

"Q. Any in sight? A. No; I couldn't see any.

"Q. Any on deck? A. None whatsoever."

No witness was produced by either side to show what the business was which these men came to discuss with the captain. We do not doubt the truthfulness of Harper's testimony, who seems to us wholly a disinterested and truthful witness.

[7, 8] The burden of proving desertion is always upon the owner of the ship, who sets it up in answer for a claim to wages. The Two Sisters, 2 W. Robinson, 125, 138. And in this case the burden rested upon the appellants. Desertion consists in the abandonment of duty by quitting the ship before the termination of the engagement, without justification, and with the intention of not returning. Kay's Law of Shipmaster & Seamen (2d Ed.) p. 374. An excellent definition of desertion was given by Dr. Lushington in The Westmoreland, 1 W. Robinson, 216 (1841). The suit was brought to recover wages. Three of the seamen had gone ashore to be advised as to whether or not the articles required them to go to Holland. At page 222 Dr. Lushington said:

"I shall not, therefore, attempt any definition of desertion generally, but content myself with the observation that, to constitute desertion in such a case as this, there must be a complete abandonment of duty without justification on the part of the mariners; and such abandonment must, moreover, be by quitting the ship."

At page 223 he continued:

"The next morning the crew, it appears, having previously sent Mr. Day, of Cowes, and having received a letter from him, went on shore without leave to advise with that gentleman as to the effect of the articles. With respect to the step so taken by the crew, I am of the opinion that it cannot be deemed as desertion; for, whatever may be the true legal aspect of the articles, I entertain a very decided opinion that there was a sufficient degree of obscurity to justify the seamen in endeavoring to obtain information as to the extent of the obligations into which they had entered on signing the ship's articles."

The desertion of a ship by seamen has always been regarded by the maritime law as very serious misconduct. A Hanseatic ordinance of 1380 made it a crime punishable by death, and a later ordinance of 1591 made it punishable by branding, and various early ordinances made it punishable by imprisonment. And even under article 221 of the Merchant Shipping Act of Great Britain of 1894, a seaman on a British ship who deserts is still liable under some circumstances to imprisonment. In view of the serious consequence likely to result, in any event, to these unfortunate and misguided men, even if no imprisonment should follow, we have examined this record with great care; but we have been able to see but one possible conclusion to be drawn therefrom.

It is admitted that the libelants withdrew from the ship on April 4th, and we find upon the evidence that they had no justification for doing so. The evidence convinces us that thereafter they never returned to the ship and resumed their duties, and that they made no attempt to return. They were therefore deserters, and being such under the British Merchant Shipping Act of 1894 (St. 57 & 58 Vict. pt. 2, § 221), they forfeited their claims to wages. See The Nigretia, 255 Fed. 56, 166 C. C. A. 384.

The decree of the court below was based solely on the finding that the men were wrongfully discharged. The conclusion which we have reached makes it unnecessary to consider the other errors assigned.

The decree is reversed, and the case remanded to the court below, with instructions to dismiss the libel.