**In the Matter of Thomas W. KELLAR, an officer and member of the crew of the SS HANS ISBRANDTSEN, Petitioner and Cross-Respondent,**

v.

**UNITED STATES of America, Respondent and Cross-Petitioner.**

No. ——.

United States District Court
E. D. Virginia,
Norfolk Division.

Sept. 27, 1967.

6. Gianfala v. Texas Company, 1955, 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775.

John M. Cloud, Norfolk, Va., for petitioner.

Harold G. Wilson, Admiralty and Shipping, Dept. of Justice, Washington, D. C., for respondent.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

Thomas W. Kellar, a member of the United States Merchant Marine holding a Third Assistant Engineer's license, signed aboard the SS HANS IS-BRANDTSEN owned and/or operated by Isbrandtsen Tanker Corporation as Third Assistant Engineer at Portland, Oregon, on May 17, 1965, for a tramp tanker foreign voyage to the Far East and/or Middle East and/or Near East and/or Europe and such other ports in the world as directed by the master, and back to a final port of discharge in the continental United States, for a term not exceeding twelve calendar months. The vessel arrived at the port of Karachi, Pakistan, on July 2, 1965, and sailed at 2030 hours on July 10, 1965. Kellar was not on board when the ship departed. On August 9, 1965, the vessel arrived at Yorktown, Virginia, at which time the crew signed off the ship's articles for the foreign voyage. Kellar went to Yorktown and removed his personal effects on the same day. On August 11, 1965, the United States Shipping Commissioner paid into the registry of this Court the sum of $595.46, representing unpaid wages earned by Kellar to July 10, 1965.

When it appeared that Kellar did not intend to report for duty prior to the ship's departure, the master made the following entry in the Official Log Book on July 10, 1965, at 2000 hours:

"Thomas W. Kellar, Third engineer, Z–265315D2, License #323228(3E). After receiving a fit for duty slip from the Seventh Day Adventist Hospital dated 7 July 1965 requested a doctor at 1400—10 July 1965. The doctor boarded the vessel at 1530 to examine Mr. Kellar for a peptic ulcer of which he complained. The doctor's findings were Flatulent Dyspepsia (Indigestion). Mr. Kellar was given medicine and told he was fit for full duty. After hearing this Mr. Kellar got sarcastic with the doctor and demanded to put in the hospital. The doctor refused, and Kellar left the vessel at 1610 saying 'We will see about this.' The vessel was sailing at 1900 this day. When a crew check was made Mr. Kellar was not aboard although all his belongings were found packed in his room. Mr. Kellar has been declared a deserter by the master, and the U. S. vice consul, Mr. Harris has been informed."

On the petition and cross-petition the issue is whether or not, in fact, Kellar deserted the ship or, as contended by Kellar, whether he was rendered sufficiently ill after going ashore at 1610 on July 10, 1965, a matter of less than three hours prior to the scheduled sailing time, to justify his nonappearance aboard the vessel. Due to the small amount involved, the case has been presented on Kellar's deposition, certain statements, exhibits, the official records, and Kellar's answers to interrogatories.

■ ■ Once a seaman has been entered in the ship's log as a deserter, he has the burden of showing that he was wrongfully entered as such. Petition of Russo, 232 F.Supp. 650 (N.D.Cal., 1964); In re Gray's Petition, 176 F.Supp. 704 (D.C.Or., 1959); Petition of Donovan, 1965 A.M.C. 1718 (N.D.Cal., 1965); Norris, The Law of Seamen, Vol. 1, § 152,

p. 177. It is perhaps better stated that, when logged as a deserter, the log constitutes prima facie evidence of its truth and imposes upon the seaman the burden of going forward with the evidence. Norris, The Law of Seamen, Vol. 1, § 135, p. 162. Absent the log entry as a deserter, it seems clear that the burden of proof rests upon the shipowner or, as in this case, the United States. In re Williams, 139 F.2d 262 (4 Cir., 1943); The City of Norwich, 279 F. 687, L.R.A. 1918C, 795 (2 Cir., 1922). Irrespective of the ultimate burden of proof, we believe that a preponderance of the credible evidence adequately supports the Government's charge that Kellar deserted the ship. Relief must, therefore, be granted to the United States on its cross-petition and the wages in controversy are forfeited in accordance with 46 U.S.C. § 701.

Standing alone, an examination of Kellar's deposition and the supporting statements [1] of four individuals would clearly not justify the conclusion reached. One statement was given by William B. Payne who, on July 9, 1965, was discharged from the vessel by the American Vice Consul for striking the chief mate and attempting to strike the master while the vessel was at the port of Sasebo, Japan, on June 14, 1965, getting ready for departure. Two statements from "bearers" at the Merchant Navy (Seamen's) Club are substantially identical. These "bearers," after indicating their observation to the effect that Kellar was vomiting blood at the Merchant Navy Club at approximately 1700 hours on July 10, state that they put Kellar into a taxi and sent him to the "Seventh Day Hospital." The fourth statement is printed in ink and then signed by James E. Crusenberry in a very legible hand. The latter was the boatswain aboard the vessel and apparently completed the voyage. We must examine these statements in the light of proven facts, both before and after July 10, 1965, together with the inconsistencies in Kellar's testimony, to determine the degree of credibility which should be accorded same.

Kellar is a resident of Louisiana and, for this reason, his medical record from the U. S. Public Health Service Hospital at New Orleans is made a part of the record. It indicates that at least a portion of his stomach was removed in 1952, but on August 15, 1961, there was no evidence of any ulcer and he was declared fit for duty. During December 1963, and January 1964, he returned on four occasions for clinical examination, and was found to be fit for duty on January 23, 1964. On July 17, 1964, he paid another visit to the clinic complaining of a shoulder pain and requesting the renewal of a prior prescription. Then on April 26, 1965, Kellar—approximately 21 days before signing aboard the vessel [2]—visited the hospital with a complaint as to a recurrence of the ulcer-type pain which had persisted for six weeks. He further complained that an injury, attributed to his having been hit in the left rib with a pipe, caused pain on coughing. The diagnosis was a healing fracture of left T–10 rib, but the X-rays taken at New Orleans revealed no evidence of any fracture of any of the ribs. Two days later he was declared fit for duty.

Kellar was not given a pre-sign-on physical examination before joining the SS HANS ISBRANDTSEN. There

1. Three statements were signed on July 21, 1965, while Kellar was still in Karachi, Pakistan, following the departure of the vessel on July 10. A fourth statement was undated and apparently came from a member of the crew of the SS HANS ISBRANDTSEN who sailed with the vessel.

2. From Kellar's answers to interrogatories we learn that he left the SS TRANS EASTERN at Saudi Arabia on or about April 10, 1965. He states that he re-joined the ship at Karachi, Pakistan, at a later date, although the time limitations would seem to indicate some question as to whether he completed this voyage as he was definitely in New Orleans on April 26. The SS TRANS EASTERN is apparently not owned or controlled by the Isbrandtsen group. Actually it appears that Kellar joined the SS HANS ISBRANDTSEN on May 4, 1965, at San Francisco, but did not sign foreign articles until May 17, 1965, at Portland, Oregon.

is no statute or judicial decision requiring same and the authorities suggest that the employer is entitled to believe every seaman he hires to be in proper physical condition for the job the seaman is to fulfill during the trip. Potter Title & Trust Co. v. Ohio Barge Line, 184 F.2d 432 (3 Cir., 1950), cert. den. 340 U.S. 955, 71 S.Ct. 567, 95 L.Ed. 689 (1951). Moreover, a pre-sign-on physical would only reveal what was apparent to the doctor on examination. Kellar does not contend that he told his new employer about any prior medical difficulties. In fact, he refers to his rib injury as having been sustained two years before joining the subject vessel, although he also claims that he fractured his ribs aboard the SS HANS ISBRANDTSEN. He claims that he did not work "at all" from the time the vessel was two days out of Portland, Oregon, until he left the ship on July 10. He states that he was "relieved from duty" due to his rib injury.

Following the last visit to the Marine Hospital at New Orleans on April 28, 1965, we note that his next visit to this same hospital was on September 16, 1966 —more than fourteen months after leaving the vessel at Karachi, Pakistan, on July 10, 1965. Kellar testified that he arrived at New Orleans on or about July 28, 1965, and visited the same hospital where he was examined by a doctor, X-rays were taken, and medicine administered. He concedes that this is the only medical assistance he received after leaving the vessel on the afternoon of July 10, 1965. The medical record from the U. S. Public Health Service Hospital indicates that no visit was made and no X-rays were taken of Kellar between April 26, 1965, and September 16, 1966, on which latter occasion he complained of a mastoid condition with negative findings.

The Medical Log of the SS HANS IS-BRANDTSEN reveals the following information about Kellar.

5–28–65–2130 hrs.—Burns left back & shoulder—"applied burn balm." (Vessel at sea)

6–9–65–1200 hrs.—X-ray ribs suspected fracture. (Vessel at Sasebo, Japan)

"Man went to hospital on his own after calling agent from ashore. Medical slip sent to hospital with agent. Medical findings: Obsolete rib fracture left side 10th and intercostal neuralgia: Adhesive taped fixation and internal medicine. Man did not report back aboard on 9th or 10th. Limited duty for about 5 days."

6–18–65–1430 hrs.—Pain in side. (Vessel at sea)

"Reported injury he claims sustained on June 1, 1965. Man already sent ashore to Dr. on this complaint. Given P.A.C. tablets this date."

7–2–65–(Time not given)—Claims sore ribs. (Vessel at Karachi, Pakistan)

"Man not on board for Dr. examination after being told Dr. would be aboard."

7–3–65–(Time not given)—Sore ribs. (Vessel at Karachi, Pakistan)

"Man on board and informed Dr. was aboard by master. Man failed to see Dr. Turning himself in to Seventh Day Advent. Hospital on Sunday."

7–10–65–1500 hrs.—Peptic ulcers (May 30th, 1965) (Vessel at Karachi, Pakistan)

"Flatulent Dyspepsia (indigestion). Advised to continue with medication supplied by 7th Day Adv. Hosp."

The Medical Log is complete for the period beginning May 27, 1965, and ending July 23, 1965. It covers complaints and treatments to all crew members. There is certainly no reason to question its accuracy as it covers all types of complaints and conditions.

The itinerary of the vessel, so far as may be pertinent, is as follows:

| Port of sailing | Date of sailing |
| --- | --- |
| Portland, Oregon | May 20, 1965 |
| Sasebo, Japan | June 14, 1965 |
| Singapore | June 23, 1965 |
| Karachi, Pakistan | July 10, 1965 |

Although Kellar testified that he had not consumed any whiskey since 1952, and that he had been relieved of all duties since May 22 (two days out of Portland), the entry made in the Official Log at 1400 hours on June 16, 1965, while the vessel was at sea, shows plainly to the contrary. Without quoting the entry verbatim, the five page report of the master reports that Kellar's first complaint of any illness or accident was on June 8 while the vessel was at anchor at Sasebo harbor. He was told that he would be sent ashore to the hospital on the morning of June 9. When the morning of June 9 arrived, Kellar did not wait for the agent, but left on his own accord and went to the hospital. A report from the doctor was received on June 11 stating that Kellar was fit for limited duty for five days.[3] That same day Kellar reported aboard and informed the chief engineer (his immediate superior) that he had broken ribs and was going home.[4] Kellar was told not to work and that his medical report had not yet been received. Kellar went ashore and, according to the log, returned at 1730 on June 11 under the influence of alcohol. He then attempted to relieve the second engineer, but was prevented from so doing by the chief engineer because of his condition. At 0730 on June 14, Kellar was told that his limited duty period was up and that he was required to work. Thirty minutes later Kellar exhibited to the master a medical slip from the New Orleans hospital stating that he had a rib fracture[5] in April 1965. He left the vessel against orders at 0830. According to the log, Kellar telephoned the American Consul using language which required the Consul to terminate the conversation. At 1855 Kellar reported aboard "in such a condition that he could hardly stand." He was due on watch at 2000 and the vessel was clear of the mooring at 2010. He did not stand watch at 2000 on June 14 and also missed the 0800 to 1200 watch on June 15 when the vessel was at sea. Kellar was confined to his room at 0800 on June 15 on orders of the master. A search was made for liquor but none was found. At 1530 on June 15, Kellar was asked to get up from his bed and walk, but was "barely able to shuffle along." He denied that he had been drinking. Even the next day it was felt that Kellar was incapable of standing watch. At 1015 on June 16, while still at sea, Kellar did not report to his station for Fire and Boat Drill. Later Kellar was shown the report from the doctor at Sasebo and he claimed that it was not the same report the doctor had completed. The lengthy log entry concludes by fining Kellar for failure to report for duty. The entire entry was read to Kellar and, in explanation, Kellar wrote in his own handwriting:

> "The master asked me if I had anything to drink. I told him I had 2 drinks which I took on top of the medicine that the doctor gave me.
>
> (s) Thomas W. Kellar
> Under protest."

---

To this Court the foregoing fairly establishes the pattern. Kellar, insisting that he had not consumed any whiskey since 1952 and contending that he had

---

3. This entry corresponds with the entry in the Medical Log made by the Chief Mate.

4. In Kellar's deposition he admits that he endeavored to leave the ship in Japan.

5. This was the diagnosis, but the X-ray revealed no fracture.

been relieved from all duties on or about May 22, 1965, is caught by his own handwriting. Mindful of the fact that log entries are not conclusive evidence of a proven fact, yet entries concerning desertion and other offenses of seamen have been held admissible even at common law. Norris, The Law of Seamen, Vol. 1, § 134, p. 161. Kellar's acts and conduct were required by law to be entered in the Official Log Book, 46 U.S.C. § 201, in default of which the master is subjected to a penalty, 46 U.S.C. § 203. Since the entry aforementioned was made strictly in accordance with 46 U.S.C. § 202, and since it was read to Kellar and he was afforded an opportunity to make an explanation, his handwritten explanation, duly signed, now condemns him and gives credence to the factual statements in the five-page entry, other than the age-old adage of having had "two drinks."

Kellar testified that he requested medical attention when the vessel arrived at Singapore but that the chief mate, Sweeney, whom he described as friendly toward him, refused to send him to a doctor. Kellar estimates that the vessel was at Singapore for approximately twelve hours. While we do not have Sweeney's testimony, it is significant that a "Requisition For and Report of Medical Attention" appears in the file for each occasion that Kellar, according to the Medical Log, requested permission to see a doctor. On the first occasion, June 9, 1965, the vessel was at Sasebo, Japan. The aforesaid "Requisition" was not signed by Kellar as he went ashore without waiting for the agent, but the form was later delivered to the hospital by the agent and completed by Dr. Y. Tomohiro. Again on July 2, 1965, at Karachi, a "Requisition" was completed but not signed by Kellar. The notation on this form corresponds with the entries in the Medical Log for July 2 and July 3. It will be recalled that Kellar turned himself in to the Seventh Day Adventist Hospital on Sunday, where he remained until July 7, 1965, as an admitted patient.[6] Kellar testified that he was not discharged from the hospital until July 9 or July 10, and that he returned to the vessel on July 10, following which he requested the chief mate to call for a doctor.[7]

Dr. R. I. McFadden of the Seventh Day Adventist Hospital at Karachi wrote a medical report dated July 7, 1965, reading as follows:

"This patient was admitted to our hospital on 4.7.65. [July 4, 1965] because of a pain in the right chest. He states that he had a fracture of the 10th right rib several months ago and he could feel the ends moving together.

"X-ray of the chest showed no evidence or a rib fracture and other pathology of the heart and the lungs. While in the hospital he was given medications and treatment and as of this date he is ready for discharge and return to full duty."

Apparently Kellar was not actually discharged from the hospital until July 9, as a later certificate from the same Dr. McFadden indicates:

"This is to certify that Mr. Thomas Kellar did not visit the hospital after

6. The admission to the hospital on Sunday is significant. While a calendar printed in the United States indicates that Sunday was on July 4, the time change in Pakistan may have caused the Sunday to fall on July 3. When Kellar was questioned as to his attempts to secure medical attention following his alleged act of vomiting blood on July 10, at 1700 hours, he stated that he went to the same hospital and was refused admittance because the master told the agent not to admit him. He testified that July 10 fell on a Saturday. He claims that he returned to the hospital on Sunday, the following day, but was again denied admission because he did not have a letter from the agent. This is at least suspect as Kellar obtained admission on July 4 (according to the certificate of the hospital physician) without any authorization letter or master's slip.

7. Kellar contends that two doctors were called aboard the vessel; the first doctor stating that Kellar should be hospitalized, and the second doctor making a finding of "indigestion." The Medical Log reflects the only doctor called was the one who made a diagnosis of "indigestion."

9.7.65. [July 9, 1965] the day of his discharge, when he was declared medically fit for duty."

On July 10, a "Requisition" for medical attention was typed, signed by Kellar, and by Dr. N. K. Shroff. Kellar admits his signature to this "Requisition," including the writing "peptic ulcers, May 30th 65," but insists that this form was signed by him at the hospital. He is unquestionably in error as Dr. Shroff was the physician called aboard the vessel to see Kellar on the afternoon of July 10 who declared Kellar fit for duty and diagnosed his ailment as Flatulent Dyspepsia. This form, as completed by Dr. Shroff, plainly shows that Kellar was fit for duty.

This Court finds it difficult to believe that a man with a long-standing ulcer condition would bypass medical attention after vomiting blood and, as indicated by answers to interrogatories, continuing to "hemorrhage during the night with blood coming out of my mouth so badly, the sheets on my bed had to be changed several times during the night." The fact is that Kellar did not thereafter see a doctor, according to his own testimony, until he returned to the U. S. Public Health Service Hospital at New Orleans on or about July 28, 1965—although the hospital records do not indicate such a visit even though Kellar claims that X-rays were taken on that occasion. The true facts are that Kellar did not see a doctor from the time he left the ship on the afternoon of July 10, 1965, until fourteen months thereafter. The Court finds that the blood vomiting incident was feigned and is incredible.

The evidence conclusively establishes that Kellar intended to leave the ship at the earliest possible moment. He admitted his dislike for the master. His personal belongings and gear were packed prior to the vessel's sailing.[8] While we think it likely that Kellar intended to return to the vessel for the sole purpose of removing his packed belongings on July 10, or otherwise arrange for someone else to remove them, whatever happened that afternoon at the Merchant Seamen's Club was probably sufficiently conducive to delay Kellar until it was too late to get his personal belongings.

The totality of the circumstances are such as to convince this Court that Kellar quit the ship and her service, without leave and against the duty of Kellar, with an intent not again to return to the ship's duty. Cloutman v. Tunison, Fed.Cas.No. 2,907 (C.C.Mass., 1833); The City of Norwich, supra.

One final point. By letter dated September 1, 1965, H. F. Frazer, Captain, U. S. Coast Guard, Portsmouth, Virginia, addressed an unsolicited letter to the undersigned judge.[9] The letter reads:

"The United States Coast Guard has completed its investigation and hearing in the case of Thomas Wilson *Kellar*, Z–265315–D2, which resulted in suspension of his seaman's papers, for alleged acts of misconduct on the U. S. vessel HANS ISBRANDTSEN.

"This is to advise you that charges of desertion were not entered against Mr. Kellar at the hearing. No further action will be taken in connection with the above named incidents.

"This office will furnish any additional information regarding the matter that may be required for your use."

No further information was requested by the Court. What evidence, if any, was considered by the Coast Guard is unknown. The Coast Guard completed its duties; the Court has now decided the

---

8. Kellar testified that he packed his gear on July 2, 1965, after the vessel arrived at Karachi as the *Port Captain* came aboard and told him, "We're going to pay you off the ship," to which Kellar replied, "Well, pay me off. I dont intend to work if my side hurts." Aside from the fact that a Port Captain would have no authority to make such a statement, it stands to reason that no Port Captain or other officer would make a statement to this effect without knowledge of the seaman's true physical condition.

9. The action was filed by Kellar on September 13, 1965. A copy of the letter in question was attached to Kellar's petition.

matter according to the law and evidence submitted to it. The effect of Coast Guard action in such a matter is fully considered in In re Larson's Petition, 152 F.Supp. 252 (E.D.Va., 1957), affirmed 255 F.2d 166 (4 Cir., 1958). Indeed, in many other aspects of this case, *Larson* is controlling, especially Kellar's dissatisfaction with his service on the vessel, his desire to terminate same, his feelings toward the master, and his expressed wish to leave the ship to Sasebo, Japan, and Karachi, Pakistan.

An order will be entered upon presentation, after endorsement by Kellar's counsel, denying the relief requested by Kellar and granting the relief requested by the United States.