## IRVINE v. THE HESPER.

Argued May 6, 1887. — Decided May 27, 1887.

On an appeal by the libellants in a cause of salvage, from a decree of the Circuit Court which awarded to them a less amount than the District Court had awarded, on an appeal from that court taken only by the libellants, this court, being unable to say, from the findings of fact by the Circuit Court, that that court did not properly exercise its discretion in making the allowance it did, affirmed its decree.

An appeal in admiralty from a District Court to a Circuit Court vacates altogether the decree of the District Court, and the case is tried *de novo;* and this is true, whether both parties appeal, or whether only the one or the other appeals.

THIS was a libel *in rem*, in admiralty, brought in the District Court of the United States for the Eastern District of Texas, by Robert Irvine and Charles L. Beissner, owners of the steam lighter Buckthorn and the steam tug Estelle, against the steamship Hesper, in a cause of salvage.

The libel set forth salvage services rendered to the Hesper by the Buckthorn and the Estelle, in pulling her off from the shore, at Galveston Island, about twenty-five miles from Galveston, Texas, where she had grounded on her voyage from Liverpool to Galveston, with a cargo of salt, in December, 1882.

The answer of the owners of the Hesper averred their readiness to pay a reasonable compensation for the services actually rendered by the two vessels, but denied that more than compensation for actual services and time was due, and denied that the services rendered were salvage services.

Proofs were taken, and the District Court, in April, 1883, 18 Fed. Rep. 692, made a decree adjudging that the libellants were entitled to compensation in the nature of salvage, for the saving of the Hesper and her cargo, and allowing to the libellants, for the services of each of the two vessels, $3000,

and to the owners of the schooner Mary E. Clark, and men who had been employed to load upon her part of the cargo of the Hesper, and to jettison such cargo, $2000; and, the claims of the owners of that schooner and of those men having been settled by the Hesper, it was ordered that the $2000 should go to the Hesper.

Both parties gave notice of appeal from this decree to the Circuit Court. The libellants perfected their appeal, but the claimants of the Hesper did not perfect theirs. Some further proof was taken in the Circuit Court, and, on the 13th of November, 1883, that court, having heard the cause, filed the following findings of fact and conclusions of law:

"This cause came on to be heard on the transcript and evidence, and was argued. Whereupon, the court, being advised of the evidence, finds the following as the facts of the case:

"1st. That, about 5.45 A.M. of the 12th day of December, A.D. 1882, the steamship Hesper, bound on a voyage from Liverpool to Galveston, being out of her course, ran aground at the southwest side of Galveston Island, about twenty miles southwest from Galveston, and nearly opposite the life-saving station. The Hesper was an iron propeller, and built in Hartlepool, England, in 1881, at a cost of twenty-two thousand pounds; her registered tonnage is, gross, 1654 tons; net, 1069 tons. Her freight capacity is 1950 tons. She has powerful engines of 750 horse-power, with steam windlasses and winches, and on said 12th of December was well found and well manned in every respect. She was ladened with a cargo of about 900 tons of salt.

"2d. That, when the Hesper went ashore, her engines were slowed down and she was making about four knots per hour. She struck easily without shock and remained upright. Her draft was then thirteen feet nine inches. The sea was smooth and there was very little wind; what there was was from the south, and the ship headed, when she struck, northeast by north. Kedge-anchors were immediately put out to the east southeast, and efforts made to get the ship off in that direction, with the ship's engines heaving on those anchors. At

the same time, a message was sent overland to Galveston, the nearest port, to the ship's agent, to send assistance.

"3d. That the agent of the ship applied to the agent of the tug Estelle, and procured that tug to go to the assistance of the Hesper. The Estelle was a long, narrow, deep boat, drawing about eight feet eight inches, and was the most powerful tow-boat in Galveston harbor, and had aboard the usual appliances of such boats. The Estelle reached the Hesper about 5 P.M. of the 12th of December and reported. The master of the Hesper endeavored to bargain with the master of the Estelle as to the cost of pulling the Hesper off, but the master of the Estelle refused to make any agreement, on the ground that he did not know how much labor and time it would take. A line was then given the Estelle, from the stern of the Hesper, which was then more off the shore than the bow, and the Estelle hauled on said line for about two hours, during which time the crew of the Hesper, with some four or five hands from the life-saving station, were throwing over cargo. No appreciable result came from this towing of the Estelle, and she desisted on the orders of the master of the Hesper.

"4th. That, in the meantime, the sea, which had been smooth, with very little swell, had become more turbulent, and there was a very decided increase in the ground swell from the southeast. Not so much, however, but that small boats were flying around the Hesper, and life-boats were running easily to and from shore. At this time of stopping hauling by the Estelle the master of the Hesper requested the Estelle to come alongside and run a heavy anchor out seaward from the Hesper, both to keep the Hesper from drifting further in, and for the Hesper to heave on to pull herself off. This the master of the Estelle refused to do, on the ground that there was too much sea on, and that he would thereby endanger his own boat, and thereupon the Estelle, taking aboard the Hesper's agent, who had come overland, proceeded back to Galveston, to procure more assistance. It was then found that the Estelle was making some water from a leak caused by a defect in the staff of the stuffing-box, which was not tight enough, and was worked loose by the strain in

hauling on the Hesper. However, the Estelle proceeded that night (of the 12th) to Galveston bar, where she laid until morning, reaching Galveston wharves about noon of the 13th of December. The Estelle lay at the wharves repairing until the morning of the 14th of December, when she took the schooner Clark, which had been engaged by the Hesper's agent to lighter cargo, in tow, and towed her down to the Hesper.

"5th. That, on the 13th of December, the ship Hesper was lively, though still aground, shifting her position slightly, but not affecting her safety, some 450 tons of water having been pumped into her ballast tanks to put her down and keep her from going nearer in shore, and her crew being engaged in throwing over cargo, while waiting for assistance. And, on the same day, the agent engaged the Buckthorn, a steam lighter, belonging to libellants, of lighter draft and power than the Estelle, to proceed to the Hesper, which she did, taking down a heavy anchor and cables, and two new hawsers, (the latter purchased by the Hesper's agent,) and a gang of men employed by the Hesper's agent, to help lighter cargo and generally assist, and also provisions and other necessaries, arriving in the night and lying by until morning.

"6th. That, on the morning of the 14th of December, the position and condition of the Hesper was much the same as on the preceding day, the weather being calm and the sea smooth. About nine o'clock in the morning, the gang of men brought down by the Buckthorn, after breakfasting aboard the Hesper, commenced to jettison cargo, and the Buckthorn carried out seaward and dropped the heavy anchor brought down from Galveston, in about 18 feet of water, connecting the same, by hawsers and cables of about 210 fathoms in length, with the steam-winch of the Hesper. The Buckthorn then also took a line from the Hesper, and pulled on her, while the machinery of the Hesper was heaving on the hawsers leading to the heavy anchors, but no relief was given. Towards noon on the 14th the Estelle arrived, with the Clark in tow. The Clark was placed alongside of the Hesper, and cargo was transferred to her by the crew and the gang aforesaid. This lightering

was kept up until about four o'clock in the afternoon, when about one-third of the cargo was removed, and nearly all the ballast water pumped out, and then the Estelle took a line from the Buckthorn, and a general effort was made by the Buckthorn, the Estelle, and the Hesper's engines, to get the Hesper off, which succeeded, whereupon the Hesper, which was uninjured, steamed to Galveston.

"7th. Where the Hesper went aground, the slope of the ground seaward is gradual, and the bottom is sand.

"8th. The prevailing and probable winds on that shore, during the month of December, are from the south and southeast, sometimes of great violence.

"9th. During the three days the Hesper was aground, there was no wind nor sea of any danger to ships, large or small, and the services rendered to the Hesper, aiding her to get safely off, were not attended with any hazard or danger, or any circumstances unusual to the towage and lighterage business, as carried on in Galveston roads, when the wind is moderate and the sea smooth.

"10th. That the value of the Hesper, which was entirely uninjured by going ashore, was one hundred thousand dollars, and the value of her cargo saved was six thousand five hundred dollars. The value of libellants' two boats, the tug Estelle, and the lighter Buckthorn, was thirty-five thousand dollars.

"11. That the Hesper, when aground as aforesaid, was in a condition of peril and distress, hardly likely to be able to get out of danger by her own efforts, even if the weather had been certain to continue favorable for many days, and certain to be wrecked if the weather should prove to be bad.

"12th. That the services rendered the Hesper by the libellants' boats, the Estelle and Buckthorn, were salvage services, but of the lowest grade, involving neither risk of property, peril of life or limb, nor unusual expense, nor gallantry, courage, or heroism, and the same will be fully compensated, by double compensation on the basis of towage and lighterage services.

"13th. The Estelle was engaged in these services three days

and one night, and the Buckthorn two days and one night. The outside earnings of either of these boats, with their appliances, is three hundred dollars per day, which, allowing as much for night work, would make the sum of twenty-one hundred dollars compensation, and double compensation is the sum of forty-two hundred dollars.

· " And the court finds the following as conclusions of law:

" 1. The services rendered by the libellants' boats, the Estelle and the Buckthorn, and their respective masters and · crews, were salvage services of the lowest grade.

" 2. That the court should award for said services the sum of forty-two hundred dollars.

" 3. That libellants should have judgment for the sum of forty-two hundred dollars and costs incurred in the District Court.

" 4th. That the libellants should pay the costs of this court." ·

Thereupon a decree was made by the Circuit Court in favor of the libellants, for $4200 and the costs of both courts. · 18 Fed. Rep. 696. From this decree the libellants appealed to this court. Their notice of appeal stated that they claimed, as their compensation for the salvage services to the vessel and cargo, one-fourth of the sum of $106,500, found by the Circuit . Court as the value of the Hesper and her cargo.

*Mr. Eppa Hunton* for appellants.

These services of salvage were rendered with skill and enterprise, and with a probable risk of lives and property. The vessels used by the salvors were steam vessels. In *The Blackwall*, 10 Wall. 1, 13, it is said:

" Steam vessels are always considered as entitled to a liberal reward, not only because the service is usually rendered by a costly instrumentality, but because the service is generally rendered with greater promptitude and is of a more effectual character. . . . Courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the reward to be decreed for salvage service: (1) The labor expended by the salvors in rendering salvage ser-

vice. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which it was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued."

It will be found that every one of these circumstances formed ingredients in this case.

*Labor expended.* — The salvors had two powerful and costly steam vessels engaged two or three days, one of which was injured in this salvage service.

*The promptitude, skill, and energy* are apparent by the evidence and findings. The Estelle went to the rescue of the Hesper as soon as she was informed of her danger, and was followed by the Buckthorn as soon as it was apparent the Estelle needed further help. The skill and energy are apparent from the success of the efforts.

*The value of the property employed* by salvors was greater than in most cases, — $35,000.

*The risk incurred.* — This, as stated above, was the risk of wrecking the lighter and steam-tug, and the possible risk of life. Risk of life is not a necessary ingredient, but it places the salvors in a higher position of merit and entitles them to a more liberal compensation. *Spencer* v. *The Charles Avery,* 1 Bond, 117; *The William Beckford,* 3 C. Rob. 356; *The Emulous,* 1 Sumner, 207.

*The value of the property saved.* — This is found to be $106,500.

*The danger from which the property was rescued.* — This, according to the 11th finding, was very great, and involved the probable total loss of the ship.

It will be seen that all the ingredients for a liberal allowance existed in this case.

In *The Blackwall,* the ship was on fire in the harbor of San Francisco; the owners of the tug got up steam; took two fire-engines on board with firemen enough to work them, and lay alongside the burning ship, and in a little more than half

an hour the flames were entirely extinguished. Decree for salvage for ten thousand dollars, — one-half to the owners of the tug.

Now, compare this case of *The Blackwall* with the one under consideration. In the former, the time was a half-hour; in the latter, two days and nights; in the former, there was but one tug; in the latter, a lighter and a tug; in the former, there was no danger; the only danger feared was the falling of the spars, which were supposed to be burning, but really were not; in the former but a small portion of the salvage service was performed by the libellants; in the latter, the whole service was performed by libellants, except in jettisoning the cargo.

Judge Story, in *Tyson* v. *Prior*, 1 Gallison, 133, says: "In general, salvage ought not to be less than one-third, unless the property saved be very valuable and the service very inconsiderable."

In the case of the ship *Henry Ewbank*, 1 Sumner, 400, the court says: "In the distribution of salvage the owner of the salvor ship ought, under ordinary circumstances, to be allowed one-third of the salvage."

In *Bearse* v. *340 Pigs of Copper*, 1 Story, 314, 326, the court says: "The maritime policy is to make a liberal allowance for salvage — the highest compensation in most meritorious cases being one moiety."

In the case of *The Ship Blaireau*, 2 Cranch, 240, 266, Chief Justice Marshall lays down the doctrine of salvage with his usual force and clearness. He says: "If we search for the motives producing this apparent prodigality in rewarding services rendered at sea, we shall find them in a liberal and enlarged policy. The allowance of a very ample compensation for those services (one very much exceeding the mere risk encountered and labor employed in effecting them) is intended as an inducement to render them, which it is for the public interests and for the general interests of humanity to hold forth to those who navigate the ocean."

In Desty's Shipping and Admiralty the doctrine of salvage and the rate of allowance is treated very clearly and all the

authorities cited. See §§ 318, 319, and 320, and the authorities cited in the notes. These authorities are very numerous, and it will be seen that in no case, having the circumstances of this case, has less been awarded as salvage than one-fourth. The allowance for salvage is in the discretion of the court, but this is a legal discretion, regulated and governed by the law and the evidence. If this discretion is not properly exercised, it is the duty of appellate courts to correct its improper exercise.

It is maintained that this discretion was not properly exercised by the Circuit Court for Texas; that great injustice was done to the libellants; and that this small allowance of salvage will discourage the efforts of salvors, and break up what has been declared very important to commerce.

It is believed the decision of the court below is erroneous, and that the same should be reversed with directions to decree to the libellants one-fourth of the value of the ship and cargo saved.

*Mr. John H. Thomas* for appellees.

MR. JUSTICE BLATCHFORD, after stating the case as reported above, delivered the opinion of the court.

It is assigned for error, that the Circuit Court erred in deciding that the services rendered by the Estelle and the Buckthorn were salvage services of the lowest grade. This is found by the Circuit Court both as a conclusion of fact and a conclusion of law. Regarding it as a conclusion of fact, it is not reviewable here. Regarding it as a conclusion of law, it is based upon the finding of fact that the salvage services involved "neither risk of property, peril of life or limb, nor unusual expense, nor gallantry, courage or heroism." The Estelle having been engaged in the services three days and one night, and the Buckthorn two days and one night, the court, treating the whole service as a service for seven days, and finding that the outside earnings of either of the boats, with its appliances, was $300 per day, being $2100 for seven days, doubled the compensation, and made it $4200,

stating that that would be a full compensation, on the basis of towage and lighterage services.

The Circuit Court, in its opinion, 18 Fed. Rep. 698, says: "Proctor for respondents in this case admits in argument, that, by reason of the service of the extra anchor furnished by the libellants, the service amounts to salvage service. But for this admission I have grave doubts whether I could have found as a fact that the services ranked above towage and lighterage service, to be compensated on the principle of a *quantum meruit.* But salvage services being taken as established, the question is one solely of amount. As a fact in the case, I have found that there was neither risk of property, peril of life or limb, nor unusual expense, nor gallantry, courage or heroism. The evidence shows there was no enterprise in going out in tempestuous weather, as the weather was moderate and the libellants' tug only went out when called upon and employed so to do. The labor and skill furnished were of the ordinary kind, such as libellants' boats were seeking as ordinary employment. Salvage, then, is to be determined entirely by the distress in which the salved property was. The distress of the Hesper was the salvors' opportunity, and the amount of salvage, on this point, determines the whole case."

The principle upon which the Circuit Court proceeded, as stated in its opinion, was, that, although storms might have come which would have destroyed the Hesper, the services actually rendered to her by the tug and the lighter were ordinary services, and that, if storms had come, the tug and the lighter might easily have sought safety.

We recently had occasion to fully consider the question of salvage in the case of *The Connemara,* 108 U. S. 352, where it was contended that the facts found by the Circuit Court did not constitute salvage service, and that, if a salvage service, it was salvage of the lowest grade, and the amount allowed was exorbitant. Holding the services to have been salvage services, this court, speaking by Mr. Justice Gray, said, (p. 359): "The amount of salvage to be awarded, although stated by the Circuit Court in the form of a conclusion of law, is largely

a matter of fact and discretion, which cannot be reduced to precise rules, but depends upon a consideration of all the circumstances of each case." It is further there said, that, by the uniform course of decision in this court, during the period in which it had jurisdiction to reverse decrees in admiralty upon both facts and law, the amount decreed below was never reduced unless for some violation of just principles, or for clear and palpable mistake, or gross over-allowance; and that, since the act of Congress of February 16, 1875, c. 77, restricting the appellate power of this court within narrower bounds, and limiting its authority to revise any decree in admiralty of the Circuit Court to questions of law, this court may, in cases of salvage as in other admiralty cases, "revise the decree appealed from for matter of law, but for matter of law only; and should not alter the decree for the reason that the amount awarded appears to be too large, unless the excess is so great that upon any reasonable view of the facts found, the award cannot be justified by the rules of law applicable to the case." The decree appealed from in that case was affirmed, upon the ground that this court could not say, upon the findings of facts, that the amount awarded was so excessive as to violate any rule of law. The same principle was applied in *The Tornado*, 109 U. S. 110, 115.

These views are equally sound in the case of an alleged under-allowance. We cannot say, from the facts found in the case at bar, that the Circuit Court did not properly exercise its discretion in making the allowance it did, even though that amount was less than the amount allowed by the District Court.

The claimants not having appealed to the Circuit Court, it is suggested that they are liable for at least the amount awarded by the District Court and that the Circuit Court could not reduce that amount, but had jurisdiction, on the actual appeal, only to increase it. It is well settled, however, that an appeal in admiralty from the District Court to the Circuit Court vacates altogether the decree of the District Court, and that the case is tried *de novo* in the Circuit Court. *Yeaton* v. *United States*, 5 Cranch, 281; *Anonymous*, 1 Gallison,

22; *The Roarer*, 1 Blatchford, 1; *The Saratoga* v. *438 Bales of Cotton*, 1 Woods, 75; *The Lucille*, 19 Wall. 73; *The Charles Morgan*, 115 U. S. 69, 75. We do not think that the fact that the claimants did not appeal from the decree of the District Court alters the rule. When the libellants appealed, they did so in view of the rule, and took the risk of the result of a trial of the case *de novo*. The whole case was opened by their appeal, as much as it would have been if both parties had appealed, or if the appeal had been taken only by the claimants.

*The decree of the Circuit Court is affirmed, with costs, and without interest to the libellants on that decree.*