## THE LUCIA.

### (District Court, S. D. Florida. March 25, 1915.)

SALVAGE ☞30—FLOATING STRANDED STEAMSHIP—AMOUNT OF COMPENSATION.
> On Sunday morning the Austrian steamship Lucia went aground on a sand bar five miles from Egmont Key, off the Florida coast. Being unable to release herself that day, on Monday morning the tug Coney was authorized by the captain to float her, and after working the most of that day and the next, and jettisoning a part of her cargo, she was floated late Tuesday afternoon and proceeded to her port under her own steam. The ship was in peril because of the danger of storms, but during the time of the operations the weather was calm, and neither the tug nor crew were in any special danger. The ship was worth $300,000 and the tug $30,000, having a crew of 10. *Held*, that the service was one of salvage, but not of a high order, and that the tug was entitled to a salvage award of $4,000, one-fourth to the crew.
>
> [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 72–74; Dec. Dig. ☞30.]

In Admiralty. Suit for salvage by Charles R. Weibe, master of the tug Coney, against the Austrian steamship Lucia. Decree for libelant.

Peter O. Knight, of Tampa, Fla., for libelant.
Geo. P. Raney, of Tampa, Fla., for respondent.

CALL, District Judge. In this cause Charles R. Weibe, master of the steam tug Edgar F. Coney, on behalf of himself, the crew, and owners of the steam tug Coney, files his libel claiming salvage from the Austrian steamship Lucia. The claimants in their answer deny that the service rendered was a salvage service. The cause in due course was referred to a commissioner, and the testimony taken, covering many typewritten pages.

From this testimony it would appear that on Sunday morning, March 22, 1914, shortly after daylight the Austrian steamship Lucia, while steaming very slow, went aground on a sand bar four or five miles from Egmont Key, and inside of the deep sea buoy. The ship was aground from the bow to about amidships in the sand. The tug Coney, while taking in a schooner, sighted the ship aground, and after taking the schooner to a safe place dropped her and went to the steamship and offered her services, which were refused. Subsequently on

that day the tug towed the schooner to Tampa, some 40 or 45 miles away, and returned to Egmont Key Sunday night. Monday morning, March 23d, after some time, the ship gave the tug a line over her stern and the tug pulled on her for some time, probably an hour, at highwater, about 12 o'clock, without accomplishing any results. The tug then returned to Tampa and procured fuel and water, and returned Monday night or early Tuesday morning to the ship and early in the morning, after daylight, one of the owners of the tug went aboard the ship. On Monday, before pulling on the ship, the captain of the tug had refused to enter into a contract with the captain of the ship for "no cure no pay."

On Tuesday, when the part owner went aboard the ship, a letter was written, either by the part owner of the tug or the captain of the ship, to the master of the tug, and signed by the master of the ship, authorizing the tug to float the ship. This was Tuesday, the 24th, but dated the 23d. Whereupon some 200 tons of cargo was jettisoned and some 350 tons of fresh water pumped from the ship's tanks. The tug Coney lay alongside the ship for some time with her engines working, with the intent to dredge the sand away and to keep the cargo jettisoned (phosphate) from setting alongside. She also ran out the ship's anchor to deep water. About 6 o'clock Tuesday afternoon, at high water, the tug took a line from the bow of the ship and commenced to pull, the engines of the ship going ahead at full speed, and at the same time pulling on the anchor that had been run by the tug. The ship began to move, and after some little time was gotten off into deep water, where she was anchored for the night, and next day under her own steam proceeded to her destination, Port Tampa.

The point where the ship grounded was exposed, being some four or five miles from Egmont Key, in the Gulf of Mexico, and had a heavy wind from the northwest or southerly direction arisen, been liable to serious danger.

There is some dispute as to the velocity of the wind while the ship was aground, but a careful review of the testimony convinces me that at no time did the velocity of the wind exceed 20 or 25 miles an hour, and this was on Sunday and decreased during Monday and Tuesday.

There are claims of danger to the tug and crew alleged in the libel and attempted to be substantiated in the testimony, and also claims of the roughness of the water, etc.; but the circumstance that the tug was able to lie alongside of the ship for three or four hours on Tuesday with lines from her bow and stern would seem to settle the question of the weather, for, had the water been very rough, the tug would have been pounded to pieces against the side of the ship; and also the soundings around the ship were taken out of a small boat, flat-bottomed.

The jettisoning of the cargo, etc., was done by the crew of the ship, aided by her machinery. The value of the Coney was about $30,000, and the value of the Lucia was in the neighborhood of $300,000. There were some ten men composing the crew of the tug. It seems clear that, at the point where the Lucia was aground, it was sand bot-

tom; but this sand was shifting sand—that is sand easily moved by the waves, tides and currents. It is spoken of by some of the witnesses as quicksand, but I think the meaning is clear.

I find that the service rendered by the tug was salvage, but of the lowest grade. There was no risk of property, peril to life or limb, unusual expense, gallantry, courage or heroism. The Hesper Case, 122 U. S. 256, 7 Sup. Ct. 1177, 30 L. Ed. 1175.

The Supreme Court in The Blackwall, 10 Wall. 1, 19 L. Ed. 870, lays down the rule for fixing compensation in salvage cases:

(a) Labor expended by the salvors in rendering the salvage service.

(b) The promptitude, skill, and energy displayed in rendering the service.

(c) The value of the property employed by the salvors, and the danger to which it is exposed in the service.

(d) The risk incurred by the salvors in saving the imperiled property.

(e) The value of the property saved.

(f) The degree of danger from which the property is saved.

As before stated, I cannot find from this testimony any great degree of danger to the property used by the salvors nor to the persons employed in the service. The property saved, the Lucia, was in a certain amount of danger, for, as has been well said, ships are intended to float, and when one goes aground there is always danger attendant. She is out of her element. The Lucia was in danger, therefore, and I think the service rendered by the Coney was more than mere towage service. But I fail to find in this case the elements that would authorize a large award for the service rendered.

Compensation for salvage service is more than mere quantum meruit, and is allowed, in a sum that will not only recompense the parties engaged in the service, for the time and labor expended, but also that others may be induced to risk property, life, and limb and save property and life from the dangers of the sea. While this is true, the amount awarded should not be excessive, and thus amount to a further imposition upon property already in distress, nor an inducement to persons to make exorbitant and unconscionable demands on the rescued property, nor in such an amount as to excite the cupidity of the rescuers or others when called on to render like services.

I recognize that on account of the dangerous currents around the Florida reefs and the menace of these reefs to shipping and navigation in those waters, the allowance of salvage to license workers have been larger, in those waters, than usually allowed, but in the instant case the considerations that induced these large awards are entirely wanting.

Taking into consideration the position of the Lucia, the time and labor of the tug and crew, the condition of the weather, I find that $4,000 is an adequate allowance for the tug and crew for the services rendered the Lucia, said amount to be divided, three-fourths to the owners of the tug and one-fourth to the crew, to be apportioned among them according to the rules of this court.

The costs of this proceeding will be first paid from the amount above allowed. It will be so ordered.