### TOZIER et al v. THE ISLANDER et al.

· First Division. Ketchikan. January 4, 1924.

No. 590–KA.

**1. Salvage ☞13—Admiralty.**

The small gas screw Islander, in distress with disabled engine, signaled the passing small gas screw vessels Diamond C and Clatawah, having in tow the barge Resolute, off Point Barrie, in Sumner Strait, Alaska. The Diamond C separated from the tow and proceeded to the Islander, and towed her to a safe anchorage. The Islander had jettisoned some lumber; her after hold was flooded, but the engine room, pilot house, and forward hold were dry, except from a leak following the tiller ropes, which could be easily controlled by bailing. *Held*, the service performed by the Diamond C was salvage service and should be compensated for as such.

**2. Salvage ☞13, 34—Custom in Alaskan Waters.**

The respondents sought to introduce evidence to the effect that it was the custom on the waters of Alaska for small vessels to proceed to the relief of a disabled vessel and render services of this nature without charge. *Held*, such custom, however, cannot affect the law of admiralty; that, if a vessel is in distress and voluntary service is rendered, it is a case of salvage and should be compensated as such, the compensation depending upon the degree of peril in which the disabled vessel was and the danger and difficulty of relieving it.

**3. Salvage ☞24—Rule for Determining Amount.**

The general rule laid down by the authorities for determining the amount which should be awarded in salvage cases embraces the following: First, the enterprise of the salvors in going to assist a vessel in distress, whether the same was rendered in tempestuous weather or otherwise; second, the degree of danger or distress from which the property was rescued, whether the peril was imminent and the rescued vessel was almost certain to be lost at the time of rescue or not; third, the degree of labor and skill required for the service and the time consumed in per-

---

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

forming it; and, fourth, the value. When all these circumstances combine, the reward should be large and liberal. When none or scarcely none is present, the salvage should be little more than the value of the work and labor.

**4. Salvage ☞24—Rule for Determining Amount.**
It is an elementary rule of the salvage law that compensation should be made, not only for the risk incurred and proportionate to the value of the property saved, but also as encouragement for the rendition of similar services.

This action is brought by the libelants against the respondents in admiralty, on the instance side of the court, in a case in salvage under admiralty rule No. 18. The testimony is conflicting in some particulars hereinafter referred to, but the following facts seem to be established:

That the respondents were, at the time of the alleged salvage services, the owners of the gas screw vessel Islander, and that in the month of March, 1922, the libelants, while proceeding from the port of Tyee to Wrangell, Alaska, with the gas screw vessels Diamond C and Clatawah, having in tow the barge Resolute, when off Point Barrie, in Sumner Strait, territory of Alaska, discovered the gas screw vessel Islander apparently disabled, adrift, and in distress, and thereupon the Diamond C, under orders from the captain of the Clatawah, separated from the tow and proceeded to the Islander, and at the request of the captain of the Islander took that vessel in tow to a place of safety. The Islander, the evidence shows, is a gas screw vessel of the cruiser type, about 40 feet in length over all.

The evidence further shows that, at the time of the services mentioned, the after hold was filled with water and the vessel was submerged astern to the rail, but that the fore part thereof, including the engine room, pilot house, and forward hold, was dry, except that there was a leak where the tiller ropes passed through the bulkhead separating the after hold from the engine room. This leak could be easily controlled by bailing. The attention of Captain Tozier, of the Clatawah, was called to the Islander by the captain thereof signaling; this signaling consisting of waving a coat or other garment. This action was taken by Captain Tozier to be a distress signal, and on account of such signal he ordered the vessel Diamond C to proceed to the assistance of the Islander. Upon the arrival of the Diamond C at the Islander, the captain of the Islander sought to

---

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

be towed ashore and asked the cost thereof. To that the captain of the Diamond C stated that he was not authorized to contract for such service, and that the matter should be left to the owner of the vessel, to be adjusted thereafter. This being agreed upon, a line was passed from the Diamond C to the Islander, and she was taken in tow to the lee of the shore, about four miles distant. In the meantime, the Clatawah, with the barge Resolute in tow, was barely holding its own against the ebb tide and a strong gale blowing down Sumner Strait.

A. H. Zeigler, of Ketchikan, for libelants.
W. A. Holzheimer, of Ketchikan, for respondents.

REED, District Judge. The service performed by the libelants was salvage service, and should be compensated for as such. See The Sirius (C. C. A.) 57 F. 851; The Cottage City (D. C.) 136 F. 496; The George B. Roberts (D. C.) 64 F. 139. In the case of The Connemara, 108 U. S. 352–357, 2 S. Ct. 754, 27 L. Ed. 751, the following words of Justice Curtis, in the case of The Alphonso, 1 Curt. 376–378, Fed. Cas. No. 17749, were quoted with approval:

"The relief of property from an impending peril of the sea, by the voluntary exertions of those who are under no legal obligation to render assistance, and the consequent ultimate safety of the property, constitute a case of salvage. It may be a case of more or less merit, according to the degree of peril in which the property was and the danger and difficulty of relieving it. But these circumstances affect the degree of the service, not its nature."

The respondents sought to introduce evidence to the effect that it was the custom in the waters of Alaska for a vessel to proceed to the relief of a disabled vessel and render services of this nature without charge. Such custom, however, cannot affect the law of admiralty that, if a vessel is in distress and voluntary service is rendered, it is a case of salvage and should be compensated as such; the compensation depending upon the degree of peril in which the disabled vessel was and the danger and difficulty of relieving it.

This being a salvage service, the question then is the degree of the service and what should be an adequate compensation therefor. As has been well said, it is almost impossible that several minds, where the testimony is conflicting, contemplating a subject of this nature, should not reach different conclu-

sions as to the amount of salvage to be decreed. The general rule laid down by the authorities for determining the amount which should be awarded embraces the following: First, the enterprise of the salvors in going to assist a vessel in distress, whether the same was rendered in tempestuous weather or otherwise; second, the decree of danger or distress from which the property was rescued, whether the peril was imminent and the rescued vessel was almost certain to be lost at the time of rescue or not; third, the degree of labor and skill required for the service and the time consumed in performing it; and, fourth, the value. When all these circumstances combine, the reward should be large and liberal. When none or scarcely any is present, the salvage should be little more than the value of the work and labor. See Cope v. Vallette Dry Dock Co., 119 U. S. 625, 7 S. Ct. 336, 30 L. Ed. 501; Irvine v. Hesper, 122 U. S. 256, 7 S. Ct. 1177, 30 L. Ed. 1175.

It is upon the point of the amount of salvage that there is a direct and irreconcilable conflict of testimony. The libelants, Captain Tozier, George Barlow, and Andrew Peterson, all experienced navigators and well acquainted with the waters of Sumner Strait, testified that there was a choppy and nasty sea on that day; that it was an ebb tide which, at the time of the rescue, had two hours yet to run, and that there was a gale blowing down the strait, known as a' Taku or Stickine wind, of from 40 to 50 miles an hour in velocity, and that there was great likelihood of the Islander being blown out to sea or upon the reef of Strait Island, about 5 miles distant; that to rescue the Islander and place her in a safe anchorage took some two hours of time, and that to place a line on the Islander involved some risk, and that in doing so part of the rail of the Diamond C was carried away; that, while the Diamond C was engaged in the work of rescue, the Clatawah and tow were unable to make any headway against the wind and tide; that the delay occasioned by the rescue probably prevented the tow from reaching the lee of Zarembo Island that day, because of the storm increasing during said delay, and that thereafter the tow was obliged to lay to for the two days following under the lee of the shore of Kupreanof Island.

On the other hand, the captain of the Islander, who it appears owns a fox ranch on Strait Island, and who testified that he is well acquainted with the waters in the neighborhood of

Point Barrie, testified that there was no imminent danger to his vessel, the Islander; that he had been drifting with the wind and tide for about 14 hours, and that, while his engine was disabled through the breaking of a poppet valve in one of the cylinders and because of trouble with the ignition, he was able to repair it in a half an hour after he got to smooth water; but that he was unable to repair it while the vessel was rolling in the waters of Sumner Strait. He further testified that there was no likelihood of his drifting out to sea or onto the reef of Strait Island. In this he was corroborated by several other witnesses. He further testified that he rigged a sail to his forestay, consisting of a hatch cover, which would have enabled him to clear the island and reach the calm waters to the leeward thereof; that the wind was not a 40 mile an hour gale, but that it was blowing probably from 20 to 30 miles an hour; and that the tide, then ebbing, would have turned to flood in a half an hour after the time of the rescue. He also placed the position of the several boats, at the time of the rescue, fully a mile nearer the shore and anchorage than the libelants, and further testified that it did not take one-half an hour to tow him to anchorage from the place where the Diamond C first picked him up.

It, however, appears from his testimony that on the night before his engine became disabled and he was compelled to cast adrift his deckload of 2x4 lumber; that in doing so his after hold became filled with water, and that thereupon he sought to place out a sea anchor to hold his ship up to the gale then blowing. This being carried away, he put out his only anchor to act as a sea anchor, hoping to drift down the strait; that this anchor caught on a rock and he was compelled to let it loose, and that thereupon he rigged a sail of his hatch cover to the forestay; that with this sail he attempted to make the lee of Kupreanof Island, but was unable to do so, because the wind blew him offshore; that for 14 hours his vessel was practically at the mercy of the tide and wind.

From this it appears to me that the vessel was in peril, and that because of such peril he signaled for rescue, and he was towed to a safe anchorage at his request.

The testimony as to the value of the salved property is widely variant. The libelants claim the value of the Islander to have been at least $4,000, while the claimant states her value

to be between $2,000 and $3,000. It is very difficult, from this testimony, to arrive at a satisfactory conclusion. While it is true that the vessel was in some peril, I am not satisfied that the vessel was in such imminent peril that she could not have made the lee of Strait Island or the shores of Sumner Strait. The canvas spread on her at the foremast could not, under any circumstances, have allowed her to sail from one to two points off the direction of the wind. While there was danger of his engine bulkhead giving away, or the boat not making the lee of an island or a safe place of anchorage, the possibility of her being able to do so or not is a mere matter of opinion of the witnesses in the case.

I am satisfied from the evidence that no extraordinary skill or seamanship was required to pass the line to the Islander and tow her to anchorage. The service was performed in about two hours and no danger was incurred by the libelants in so doing. The salvage was meritorious, and the Islander was of the probable value of from $3,000 to $3,500, and I think that more than the value of the labor and services should be awarded to the libelants, because it was a salvage service, and the law is that such services should be rewarded. As said in the case of The Impoco (D. C.) 287 F. 400, the principal element in fixing the amount of salvage compensation is the benefit conferred. In this case, the Islander was in danger, and, while it cannot be said that the vessel would certainly have been lost, yet it was in danger of being lost, and the lives of the crew were also in danger. The testimony shows that the libelants rendered a bill of $300 for services, the payment of which was refused by the respondents. I am of the opinion that this bill included the cost of the problematical delay to the tow of two days under the lee of Kupreanof Island, awaiting the abating of the storm, and that it also included the damage to the Diamond C and the value of the anchor and line delivered to the Islander, but not returned. The testimony does not show that the delay of two days, in awaiting the abating of the storm, was occasioned by the time consumed in rescuing the Islander. Captain Tozier stated that the storm was increasing, and that possibly he could have made the passage across Sumner Strait to the lee of Zarembo Island that day, but his testimony is not positive on this point.

The respondents claim that there should be no amount allowed greater than the sum of $50, which they allege would be a liberal allowance for the time actually involved in towing the Islander to safe anchorage. I am not inclined to view the compensation for the service in that way. It is an elementary rule of the salvage law that compensation should be made, not only for the risk incurred and proportionate to the value of the property saved, but also as encouragement for the rendition of similar services.

I think, however, that $250 would be a fair and just reward for the services rendered, and a fair and liberal compensation to the libelants, and that sum is allowed for the salvage service. It appears from the testimony that the respondents tendered the libelants the sum of $300 after the action was commenced, but such tender did not include the costs then incurred. Under the circumstances of the case, I think that the costs should follow the judgment up to the time of the tender, but after that time that each party should pay its own costs.

It is therefore decreed that the libelants do have and recover from the respondents the sum of $250 and costs as herein stated.