## JACKMAN v. UNITED STATES.
### No. 2631.

Circuit Court of Appeals, First Circuit.
Feb. 25, 1932.

Essex S. Abbott, of Boston, Mass. (Joseph V. Carroll and Abbott & Carroll, all of Boston, Mass., on the brief), for appellant.

Ellen L. Buckley, Asst. U. S. Atty., of Boston, Mass. (Frederick H. Tarr, U. S. Atty., and Hubert C. Thompson, Asst. U. S. Atty., both of Boston, Mass., on the brief), for the United States.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal in a proceeding in admiralty to forfeit the gas screw vessel Marge, her engines, boats, and other equipment under section 4377, R. S. (46 USCA § 325), by reason of a violation of sections 4214, 4218, 4320, and 4377 of the Revised Statutes of the United States (46 USCA §§ 103, 106, 262, 325), title 2, § 3 of the National Prohibition Act (27 USCA § 12), title 1, § 1, Schedule 8, paragraphs 802 and 814, and title 4, §§ 433 and 450 of the Tariff Act of 1930 (19 USCA § 1001, pars. 802, 814; §§ 1433, 1450).

The government relies chiefly on sections 4214, 4377, R. S. (46 USCA §§ 103, 325), and section 615 of the Tariff Act of 1930 (19 USCA § 1615). The Marge was a gas screw yacht 60.9 feet in length, with a beam of 11.5 feet, and a depth of 5.8 feet. She was equipped with three Liberty engines of 400 or 450 horse power each, with a speed of 30 to 35 knots. Since 1925 her pilot house had been covered with iron plates, and, after being shot at and two of her crew injured in 1930, several changes were made in her power plant, a new pilot house built, and both that and her engine house cabin are now armor plated, and the glass in her portholes and windows in the present pilot house is an inch in thickness. She had two holds, one forward used as quarters for the

crew, and one aft of the engine house, the latter with two hatches, and carried on deck after amidship, at the time of the seizure, two large dories, or fishing boats, such as are used in fishing on the Grand Banks, and obviously not of the type of tenders usually found on pleasure yachts, but more suitable for transhipping liquors from vessels lying outside the twelve-mile limit, and for discharging liquors along the coast. While she was licensed as a pleasure yacht, she carried no accommodations for passengers in the way of seats or galley equipment. She was painted gray, and for some time previous to October 22, 1930, she had been under observation by the Coast Guard and customs officials —partly because of the fact that she frequently tied up at Provincetown during the day and toward night sailed northward toward the open sea, with only a crew on board so far as could be observed, and would be found in Provincetown the next morning.

None of the Coast Guard officers at Provincetown, or the customs officers who testified, and whose duty it was to inspect and watch for vessels suspected of violating the federal laws, ever saw in their district a motorboat of similar appearance or with similar equipment to that of the Marge, and the inspector of customs, who had known the boat since 1925, testified because of her distinctive appearance he could in the daytime recognize her a mile or two away.

From the cross-examination of the master of the Marge, the trial judge properly, we think, inferred that she had previously been in trouble with the federal officials for violation of the federal laws, and, as he stated in his findings: "The structure, equipment and history of the boat were such that it taxes one's credulity to believe that it was being used for purposes purely innocent; on the contrary, it is impossible to escape the conviction that the vessel was a rum runner masquerading on the high seas as a pleasure vessel." We concur in his deductions.

On the afternoon of October 22 she came through the canal from the westward, was then boarded and examined by the Coast Guard officers, found to be unladen, and with no one but the crew on board. Later in the afternoon she was observed sailing northward past Provincetown and toward the open sea.

About 8:45 p. m. of that day, police officers patrolling the Marblehead shore opposite Salem—in which city the owner of the Marge lived—saw a large motorboat running without lights, estimated to be about 60 or 70 feet long, with pilot house forward of amidship and shaped like that of the Marge, and with what appeared to be two "Grand Bankers," or fishing dories, on the after deck. She then appeared to be heavily laden, and was headed toward what is known as Wyman's Cove in Salem Harbor. As she passed about three hundred feet off shore, her outlines could be seen by the officers as she passed between the Marblehead shore and the lights on the Salem shore. The night was clear, and the visibility was good, though there was no moon.

About 12:40 a. m. the same officers patrolling the Marblehead shore saw a large motorboat of the same type and general appearance come out of Salem Harbor, and in going out she passed within thirty feet of them. She was then high in the water and evidently without cargo. As she went out, there was one dory of the Grand Banks type on the after deck, and another was being towed. No other motorboat of that type was seen in Salem Harbor by the officers that night.

The police officers immediately went to Wyman's Cove, where they found and seized over 600 sacks containing intoxicating liquors, including 25 sacks of peach brandy, the latter bearing French labels.

On the following morning about 8 o'clock, the Coast Guard officers in making their inspection of the harbor at Provincetown came alongside the Marge, and, as their boat was lower in the water, they saw on the deck of the Marge under one of the hatch covers, and concealed from any one boarding the vessel by the hatch cover and by the dories, a bag which excited their curiosity. It was found to contain a dozen bottles labelled peach brandy, which afterward proved to have exactly the same labels and to be of the same chemical analysis as that found by the police officers earlier in the morning on the shore of Wyman's Cove in Salem Harbor.

On learning of the seizure of the liquors at Wyman's Cove, the customs officers took the liquors there seized and the bottles found on board the Marge into their possession, and seized and libelled the Marge, claiming a forfeiture of both the boat and her equipment. No one was found on board at the time of seizure, and no arrest was made.

The claimant later appeared and claimed the boat as owner, and denied that she had violated any of the sections of the statutes above enumerated.

The three police officers who watched the motorboat go in and out of Salem Harbor

on the night of the 22d later either picked the Marge out from among several motorboats alongside the wharf at Boston, where she had been taken by the customs officers, or identified her as resembling the boat they saw going in and out of Salem Harbor. The characteristics by which they identified her were the shape of her pilot house and its location, the length of the boat, and the fishing dories that were found on her. They noted her particularly during that evening, so far as the visibility permitted, as she was the only boat of that type they had ever seen in Salem Harbor. Counsel for claimant made strenuous efforts in cross-examination to force the witnesses to admit that they could readily have mistaken the Marge for another boat known as the Follow Me; that, when they went to Boston, they knew they were going to see the Marge, and that they saw her name on the stern before they identified her as the boat they saw in Salem Harbor on the night of October 22d. The officers, however, were not shaken in their insistence that they could not mistake the Follow Me for the Marge, particularly since on one the pilot house was amidship, and on the other it was forward, and the Follow Me was considerably shorter in length; or in their insistence that, without seeing her name, they picked the Marge out and identified her as resembling in outline, length, location of pilot house and dories carried as the boat they saw in Salem Harbor on the night of October 22d.

An expert chemist testified that the peach brandy seized on board the Marge and that found in Wyman's Cove had exactly the same labels and showed so nearly the same chemical analysis that in his opinion they were both from the same lot and made at the same time; that the variance was so slight they could not have been manufactured at different times.

■ It is, of course, clear that, if the Marge was the same boat that went into Salem Harbor on the night of October 22d and unloaded from her hold the lot of liquors found at Wyman's Cove, she was forfeitable under section 4377 of the Revised Statutes. She was licensed as a pleasure boat, and, if she was transporting intoxicating liquors in the quantity found at Wyman's Cove, it was sufficient to warrant a finding that she was transporting merchandise for hire, and engaged in a trade other than that for which she was licensed. United States v. Blackwood (C. C. A.) 47 F.(2d) 849; The Conejo (C. C. A.) 16 F.(2d) 264.

The District Court, after reviewing the evidence, found that she was the same boat which sailed into Salem Harbor on the night of October 22d and unloaded at Wyman's Cove, and declared her forfeited.

■ In admiralty the findings of fact by the trial judge, while not controlling in this court, will not be disturbed, unless they appear to be clearly wrong. The Lake Monroe (C. C. A.) 271 F. 474.

■ While no single piece of evidence was sufficient to warrant a holding that the Marge entered Salem Harbor on the night of October 22d and unloaded the intoxicating liquors found there, nevertheless, on taking into consideration all the evidence, her armored pilot house and engine house cover, the thick glass in the windows of her pilot house, her great speed, her gray paint, and, though claimed to be a pleasure craft, her obvious lack of accommodations for passengers, her equipment of two Grand Banks fishing dories, the identification by the police officers, even if not absolute, and the testimony of the chemist, one cannot but feel a settled conviction that the Marge on the night of October 22d, as alleged in the libel, was engaged in a business other than that for which she was licensed, in that she was transporting liquors for pay in violation of her license.

■ In any event, the District Court was right in holding that, unexplained, the evidence was sufficient to warrant a forfeiture, and the burden under section 4380 Rev. St. (46 USCA § 328) and section 615 of the Tariff Act of 1930 (19 USCA § 1615) was then on the claimant to explain the evidence consistent with an absence of any violation of the law. United States v. Davidson (C. C. A.) 50 F.(2d) 517, 521. The claimant himself, who lived in Salem, did not testify, but the court saw the witnesses offered by the claimant to meet this burden, one of whom testified that the Marge was tied up at the wharf at Provincetown during the night of October 22d, and two others, including the master, that she was there at 5 or 6 o'clock on the night of October 22d, and also was there the following morning. The trial judge, however, who saw and heard them, could best determine as to their credibility, and he obviously did not believe them. This court cannot say he was manifestly wrong in rejecting their testimony, and, if they were not telling the truth, it only goes to support his conclusions that the Marge was forfeitable for the reasons set forth above.

The case was heard in the District Court on February 11, 1931, and was taken under advisement by the court. On March 24 a

motion to strike out certain parts of the evidence was filed and denied, and an opinion handed down by the court, ordering the vessel forfeited.

On March 27, 1931, the claimant filed a motion to appraise and release the boat on bond under section 938, R. S. (28 USCA § 751). On May 11, 1931, which was before the decision of this court in the case of United States v. Davidson, 50 F.(2d) 517, the cause was heard on the motion to release on bond, which was denied, and decree of forfeiture was entered, and the Marge was ordered by the Secretary of the Treasury to be turned over to the commander of the Coast Guard at Boston for use in the enforcement of the customs laws.

On May 21, 1931, the claimant gave notice of an appeal from the decree of forfeiture and denial of motion to release the vessel on bond, which had the effect of vacating the order of forfeiture of the District Court. Irvine v. The Hesper, 122 U. S. 256, 7 S. Ct. 1177, 30 L. Ed. 1175. Until the decree of forfeiture of the boat becomes final, under the decision of this court in United States v. Davidson, supra, the forfeiture being decreed under the customs provisions relating to the enrolling and licensing of vessels, the vessel should have been released under section 938, R. S. See, also, Maniscalco v. United States (C. C. A.) 53 F.(2d) 737, 738.

The decree of the District Court ordering forfeiture of the vessel is affirmed, subject to the right of the claimant to apply to that court for release of the vessel on bond.