**CANADIAN PACIFIC RAILWAY CO.,**
a corporation, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 16334.

United States Court of Appeals
Ninth Circuit.

Dec. 7, 1959.

Hayman, 1952, 342 U.S. 205, 220, 72 S. Ct. 263, 96 L.Ed. 232; Ladner v. United States, 1958, 358 U.S. 169, 178, 179, 79 S.Ct. 209, 3 L.Ed.2d 199.

914

Bogle, Bogle & Gates, Thomas L. Morrow, Seattle, Wash., for appellant.

Keith R. Ferguson, Sp. Asst. to the Atty. Gen., Charles P. Moriarty, U. S. Atty., Jacob A. Mikkelborg, Richard F. Broz, Asst. U. S. Attys., Seattle, Wash., for appellee.

Before HAMLEY, MAGRUDER and MERRILL, Circuit Judges.

MERRILL, Circuit Judge.

This action was instituted by a libel in personam in admiralty filed by the United States against the Canadian Pacific Railway Co., as owner and operator of the SS Princess Louise. The United States had suffered damage in the breaking of its submarine cable lying beneath the waters of Puget Sound and forming a part of the Alaska Communications System. It alleged fault on the part of the Princess Louise in fouling the cable with its anchor while maneuvering in an attempt to dock at Pier 64 in Seattle.

Judgment of the District Court was in favor of the United States in the sum of $6,954.23. Cross-appeals have been taken from this judgment. Canadian Pacific contends that no case for damages has been made. The United States contends that judgment should have been for $8,937.50.

The contentions of Canadian Pacific relate to the sufficiency of the evidence to establish either liability or damage.

The cable involved commenced at Pier 57, Seattle, and, lying on the bottom,

crossed Elliott Bay and Puget Sound in a westerly direction to Bainbridge Island. Its existence was shown on navigation charts by a designated "cable area" extending from the seawall out into Elliott Bay a distance of approximately 600 yards. The northern and southern boundaries of this cable area were depicted by parallel dotted lines.

On May 21, 1955, at about 3:00 p. m., the Princess Louise entered Elliott Bay from the north and began maneuvers in an attempt to dock on the southern side of Pier 64. This pier is some 400 yards northwest of Pier 57 and 295 yards north of the northern boundary of the marked cable area. A southeast gale of thirty-five to forty miles an hour was blowing, making docking difficult.

The maneuver, as described by the captain of the ship, was as follows: On a southeasterly course, the ship was brought down opposite Pier 64 and then commenced turning left toward the pier. With the ship southwest of Pier 64 and about 900 feet off Pier 63, the next pier to the south, the starboard anchor was dropped to 30 fathoms to steady the bow. On this approach the captain found the stern was getting too close to Pier 63. He decided to back out and try again. This he did. On the second approach, a tug came alongside and offered assistance, which was accepted. The ship docked at 3:48 p. m. The anchor had remained at 30 fathoms until docking was completed.

The District Court found that the Princess Louise was negligent in dropping and dragging anchor in a marked and known cable area. Canadian Pacific contends that the evidence does not support this finding, but on the contrary demonstrates that contact with the cable, if any, must have occurred at a point outside the marked cable area.

As we read the record, it supports a conclusion that the cable was fouled while the ship was backing away from Pier 64 preliminary to making its second approach.

Testimony relating to the ship's course in backing out is in conflict. Canadian Pacific contends that the ship backed straight out, veering, if at all, to the north and away from the cable area. There is testimony to this effect, but it is disputed.

The Seattle executive officer of the Alaska Communications System, an army colonel, was an eyewitness to the maneuver from his office on shore. He testified positively that the ship's sternway course from Pier 64 was SSW toward Pier 57; that the ship backed into the cable area; that its forward anchor was out with the anchor chain stretched ahead of the ship, indicating that the anchor was then in contact either with the bottom or with the cable. He estimated that the ship on this course was 600 feet off Pier 57. This would have placed the ship squarely within the marked area.

Testimony of the captain of the Princess Louise is far from clear as to the precise course taken in backing out. Normally, as he explained, the propeller action of this ship would cause her when backing to veer to the left, which in this case would be to the north or away from the cable area. He testified: "When I first discovered that I had to back out, I put her full astern and first of all she backed out in the direction she should with the action of her propeller, which is to the left or port." He was then asked: "Now what is her backing action under conditions where you have a southeast wind?" His answer was: "In the first instance she will follow her natural inclination to go to the left, but in a short period of time she will back to the right, the wind influence blowing the bow down and the stern going up into the wind."

If this is what occurred, she could well have backed into the cable area, as the colonel had testified she did.

Canadian Pacific contends that, if the Princess Louise had indeed fouled the cable, the evidence as to the location of the point of contact demonstrates that contact was made outside the marked cable area and that no fault can be at-

tributed to it under these circumstances. The record does not support this contention.

During the trial, the captain of the cable repair ship plotted the course which the cable had taken immediately prior to the time of the break. He fixed the point at which the broken end on the shore side had been picked up by the cable ship. This point was south of the true course of the cable by 75 yards (indicating that the cable had been dragged to the south prior to its breaking) and approximately 3,300 feet from the seawall. The cable picked up from the seawall to the break measured 3,450 feet.

Contact with the cable had first been made shoreward of the break. The cable bore indications that something had been dragged along it, damage to the cable becoming more severe until the point of the break was reached. The foreman of the ship testified that these indications of contact with the cable commenced approximately 1,500 feet from shore. A point on the plotted cable course 1,500 feet from shore is within the marked cable area.[1]

Canadian Pacific contends that the depth of water at a point 1,500 feet from shore is such that an anchor at 30 fathoms, or 180 feet, could not possibly have reached the cable. The record does not support this contention.

If a point of contact 1,500 feet from shore be adopted, the charted point of depth closest to it is seaward of it. The depth there shown is 197 feet. The next closest marking, shoreward from the point of contact and slightly north of the cable area, is 91 feet. The sternway course of the ship would appear to have been between these two points in a depth of between 91 and 197 feet and at a point where depth was increasing sharply. We cannot say upon this record that, with the anchor at 180 feet, contact with the cable within the marked area was impossible.

There was, then, evidence which, if accepted, would place the point of contact within the marked cable area. We conclude that the finding of the court, that the anchor was dragged in a marked and known cable area, cannot be said to be clearly erroneous.

Canadian Pacific assigns error in the refusal of the District Court to admit in evidence a current navigation chart showing the manner in which the cable area was marked at the time of trial. The offer of proof was that the chart would show that the area was then marked for the full course of the cable across Puget Sound. Canadian Pacific contends that this proof would have established the feasibility of such marking and the inadequacies of the marking which existed at the time of the accident.

Since the fact as found was that the anchor was dragged in the cable area, as marked and known at the time of the accident, this evidence was not material and its exclusion was not error.

Canadian Pacific next contends that there is no competent evidence as to the extent of damage sustained by the United States by virtue of the break.

The evidence of damage was presented by the chief cost accountant of Alaska Communications System. He identified a job order ledger sheet prepared by him in May, 1955, purporting to show the items of expense incurred by the United States from March 23 to 26, 1955, in the repairing of the break.

The evidence shows that this ledger sheet constituted a government record. Further, it was prepared in the regular course of business of the Alaska Communications System. Further, it was not prepared for purposes of compensation or litigation. It was the regular course of business of Alaska Communications Sys-

---

1. The foreman further testified that approximately 1,500 feet of cable was damaged. This figure was changed upon cross-examination to approximately 1,700 feet. If the latter figure be accepted as the distance from the break to the point of contact, that point appears to be within the marked area, although the result is questionable if the former figure be accepted.

tem to prepare such ledger sheets for the purpose of determining whether items were to be allocated to capital or to current expenditure. Cf. Hartzog v. United States, 4 Cir., 1954, 217 F.2d 706.

The ledger figures were taken from time sheets (individually prepared by each person employed in the business of repair), from maintenance records of the cable repair ship and from records of materials used. The ledger sheet was thus prepared from original slips, invoices and records in the possession of the government and acquired by it in the regular course of business. Pursuant to army regulations, these original documents were destroyed after the ledger sheet had been prepared and that sheet then became the official army record of the cost of the particular repair job. Having reference to this ledger sheet, the witness testified that the total cost of repair, as shown there, was $6,954.23.

The United States offered the ledger sheet in evidence. Canadian Pacific objected to the offer as hearsay. The objection was sustained. Over the objection of Canadian Pacific, the testimony of the witness was permitted to stand.

■■■ We are satisfied that the ledger sheet upon which the testimony was based was admissible as a record made in the regular course of business and as a government record. 28 U.S.C. §§ 1732 and 1733.[2] The United States, in its cross-appeal, has assigned error in the exclusion of this evidence.

■■ The testimony of the witness, which remains, was no more than a report upon the contents of the ledger sheet prepared by him and was no more objectionable as hearsay than was the record itself. The best evidence rule is not available since Canadian Pacific itself sought and secured the erroneous exclusion of the ledger sheet. Such testimony, then, constituted proof of damage.

With reference to the exclusion of this evidence, the United States contended that even as hearsay it was admissible since in admiralty this objection goes only to the weight of the evidence. In view of the fact that the evidence was admissible within the conventional business record exception to the hearsay rule and as a government record, it becomes unnecessary to consider alternative contentions made by the United States.

We conclude, upon the appeal of Canadian Pacific, that judgment must be affirmed.

The United States, upon its cross-appeal, contends that judgment should be increased to $8,937.50. No formal appeal was taken. In its brief, the United States has shown itself as cross-appellant and has specified error.

Canadian Pacific first contends that the United States has no standing to maintain this cross-appeal since it has not appealed in accordance with the provisions of Rule 73, Federal Rules of Civil Procedure, 28 U.S.C.A.

2.  § 1732: "In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

§ 1733: "(a) Books or records of account or minutes of proceedings of any department or agency of the United States shall be admissible to prove the act, transaction or occurrence as a memorandum of which the same were made or kept. * * * "

In admiralty, however, cross-appeals traditionally have not been held necessary. Standard Oil Co. of New Jersey v. Southern Pacific Co., 1924, 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; The John Twohy, 1921, 255 U.S. 77, 41 S.Ct. 251, 65 L.Ed. 511; Reid v. Fargo, 1916, 241 U.S. 544, 36 S.Ct. 712, 60 L.Ed. 1156; Irvine v. Hesper, 1886, 122 U.S. 256, 7 S.Ct. 1177, 30 L.Ed. 1175; The Lucille, 1873, 19 Wall. 73, 74, 22 L.Ed. 64. It is true that this rule is based upon the concept of an admiralty appeal as a trial de novo and that the trial de novo concept has been substantially restricted. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Titus v. Santorini, 9 Cir., 1958, 258 F.2d 352; Trihey v. Transocean Air Lines, 9 Cir., 1958, 255 F.2d 824; Peterson v. United States, 9 Cir., 1955, 224 F.2d 748; City of Long Beach v. American President Lines, 9 Cir., 1955, 223 F.2d 853; and see Richfield Oil Corporation v. United States, 9 Cir., 1957, 248 F.2d 217, 225, footnote 7.

However, if the formal taking of a cross-appeal is now to be made necessary in admiralty, such a change of procedure, in our view, should be accomplished by rule of court and not by court decision. Such was the method followed in the case upon which Canadian Pacific relies, International Milling Co. v. Brown Steamship Co., 2 Cir., 1959, 264 F.2d 803. There the rules of the Second Circuit had been amended to provide that appeals in admiralty should be taken in accordance with the provisions of the Federal Rules of Civil Procedure.[3] The admiralty rules of this circuit have not been so amended.

Accordingly, we shall consider the cross-appeal of the United States as properly before us.

It is contended by the United States that the District Court erred in failing to allow additional sums for the daily operational cost of the cable repair ship. We are satisfied that there is a failure of proof in this respect.

Proof is confined to the testimony of the chief cost accountant of Alaska Communications System as to the average daily operational cost of the repair ship. Such average was determined by him through a statistical study of all factors involved over a period of several years. As a result of this study, he had concluded that $1,500.00 a day would cover operational expense without providing profit or resulting in loss. The study had been undertaken for the purpose of determining a basis upon which the ship could be chartered to others by the United States. As a result of the study, the charter fee had been fixed at $1,500.00 a day.

By its cross-appeal, the United States seeks to increase its recovery to the equivalent of $1,500.00 a day for the period of time during which the cable ship was put to use in this particular repair job.

As we have seen, judgment was based upon proof of actual cost of repair. The United States is not entitled to claim as additional damage the difference between actual cost and average cost.

The United States protests that the proof of actual cost did not include such items as overhead and preparation of the ship for this particular job of repair. Assuming that these be proper items of damage, the record is wholly lacking in proof of the amount of overhead or preparation expense properly attributable to this specific job of repair.

Upon both the appeal of Canadian Pacific and the cross-appeal of the United States, judgment is affirmed.

3. 2 Cir., Rule 10. See also: 3 Cir., Rule 11; 4 Cir., Rule 34; 6 Cir., Rule 10; 7 Cir., Rule 10, 28 U.S.C.A.; and compare Horton & Horton, Inc. v. The S/S Robert E. Hopkins, 5 Cir., 1959, 269 F. 2d 914 with 5 Cir., Rule 12.