## THE TAHOMA.

### PIERCE et al. v. UNITED STATES et al.
### No. 8140.

Circuit Court of Appeals, Ninth Circuit.
Dec. 22, 1936.

A. H. Ziegler, of Ketchikan, Alaska, for appellants.

Wm. A. Holzheimer, U. S. Atty., and Geo. W. Folta, Asst. U. S. Atty., both of Juneau, Alaska, for appellees.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

On a libel filed by appellee, the decree condemned as forfeited the oil screw Tahoma for violation of the shipping and custom laws.

In 46 U.S.C.A. § 11, it is provided that certain vessels owned by citizens of the United States may be registered pursuant to law. Section 19 provides that an oath must be taken and subscribed by the owner to procure registration. Section 25 provides for the issuance of a certificate of registry on compliance with the requirements of the law.

Section 23 provides: "A certificate of registry shall be solely used for the vessel for which it is granted, and shall not be sold, lent, or otherwise disposed of, to any person whomsoever; * * * and if any foreigner, or any person for the use and benefit of such foreigner, shall purchase or otherwise become entitled to the whole, or any part or share of, or interest in such vessel, the same being within a dis-

350

trict of the United States, the certificate shall, within seven days after such purchase, change, or transfer of property, be delivered up to the collector of the district; and if any such purchase, change, or transfer of property shall happen when such vessel shall be at any foreign port or place, or at sea, then the master or person having the charge or command thereof shall, within eight days after his arrival within any district of the United States, deliver up the certificate to the collector of such district."

Section 40 provides: "When the master or person having the charge or command of a registered vessel is changed, the owner, or one of the owners, or the new master of such vessel, shall report such change to the collector of the district where the same has happened, or where the vessel shall first be after the same has happened, and shall produce to him the certificate of registry of such vessel, and shall make oath, showing that such new master is a citizen of the United States, and the manner in which or means whereby he is so a citizen. * * * If the change is not reported, or if the oath is not taken, as above directed, the registry of such vessel shall be void, and the master or person having the charge or command of her shall be liable to a penalty of $100."

Section 41 provides: "If any vessel registered as a vessel of the United States shall be sold or transferred, in whole or in part, by way of trust, confidence, or otherwise, to a subject or citizen of any foreign prince or state, and such sale or transfer shall not be made known, as hereinbefore directed, such vessel, together with her tackle, apparel, and furniture, shall be forfeited."

Section 60 provides: "Whenever any certificate of registry, * * * to any vessel, is knowingly and fraudulently obtained or used for any vessel not entitled to the benefit thereof, such vessel, with her tackle, apparel, and furniture, shall be liable to forfeiture."

Section 808 provides: "It shall be unlawful to sell, transfer or mortgage, or, except under regulations prescribed by the board, to charter, any vessel purchased from the board or documented under the laws of the United States to any person not a citizen of the United States, or to put the same under a foreign registry or flag, without first obtaining the board's approval.

"Any vessel chartered, sold, transferred or mortgaged to a person not a citizen of the United States or placed under a foreign registry or flag, or operated, in violation of any provision of this section shall be forfeited to the United States."

Section 221 provides: "Vessels registered pursuant to law and no others, except such as shall be duly qualified according to law for carrying on the coasting or fishing trade, shall be deemed vessels of the United States, and entitled to the benefits and privileges appertaining to such vessels; but no such vessel shall enjoy such benefits and privileges longer than it shall continue to be wholly owned by a citizen or citizens of the United States or a corporation created under the laws of any of the States thereof, and be commanded by a citizen of the United States."

It appears that the claimant operated the Tahoma under a certificate of registry issued to him in 1925. The Tahoma was engaged in a foreign trade; that is, transporting catches of halibut from the high seas to Prince Rupert, a foreign port, for shipment through Canada to markets in the United States, without payment of duty. Prior to September 13, 1934, she became heavily indebted to F. E. Hunt, Ltd., a Canadian corporation, and that corporation began to operate the vessel in May, 1933. The vessel was seized by the Coast Guard on the high seas, off the coast of Alaska, on September 13, 1934. Appellee contends that the transaction by which F. E. Hunt, Ltd., assumed management, was a sale or transfer "by way of trust, confidence or otherwise" to a citizen of a foreign country. Appellant contends that F. E. Hunt, Ltd., merely managed the operation of the vessel for benefit of creditors, and that there was no transfer of any interest in the vessel.

The manager of F. E. Hunt, Ltd., was one G. W. Nickerson. On May 18, 1933, he wrote a letter to Fishing Vessel Owners Marine Ways in Seattle, Wash., a creditor of claimant, a part of which letter is as follows:

"* * * For some time it has been evident to us that this man [claimant] is not adapted to carrying on successfully halibut fishing from a boat the size of the 'Tahoma,' therefore we have persuaded him to agree to make a trade, taking for his equity a small American boat that would cost about Twenty-five Hundred Dollars ($2500.00), thus bring the entire

obligation, including interest to date, about Eleven Thousand Dollars ($11,000.00), the creditors being You, the Atlas Engine Co., ourselves, and an account of about One Hundred Dollars ($100.00) with the Norvy [Nordby] Supply Co. in Ketchikan.

"Before making this deal we require to have assurance from you and the Atlas people that you are willing to wait for your money until it is earned by the boat or she can be sold. We would be agreeable to dividing between you and the Atlas 50% of her earning after insurance and upkeep had been taken off * * *.

"We have one or two men in sight who might take this boat, but they would not entertain the proposition unless assured, that in the event of them touching at Seattle, no attachment against their trip would be made. If you know of any well qualified Captain in Seattle who would care to operate this boat or anyone who cares to buy her on a down payment of about Three Thousand Dollars ($3000.00), we would be glad to have you advise us.

"We are sending a copy of this letter to the Atlas Engine Co. in Seattle, and would suggest that you get in touch with them, and advise us at once as to your decision, as it is not desirous to have this boat tied up indefinitely."

These two creditors replied by letter dated May 31, 1933, stating that "we do not feel inclined to accept the proposition as outlined by you." G. W. Nickerson replied by letter dated June 5, 1933, stating in part as follows: "We wonder if you are aware that under our laws we could attach this vessel for debt, sell her, and obtain a Canadian register, and you would have no claim, in order [other] words that we would be a preferred account. Unless you accept our proposition, we may eventually have to do this, as we cannot afford to have this boat tied up indefinitely, and she cannot be profitably operated, unless she is free to go to Seattle to sell her fish, when she has a reasonable trip. We can obtain a very good man here to take the boat out, and are satisfied that in normal conditions, she would quickly liquidate her debt."

On June 12, 1933, the two creditors replied by letter, which is in part as follows:

"There are a few features of the proposition made in your letter of May 18th, which are not quite clear to us and in order to expedite matters and remove the necessity of delay through further correspondence, we will accept your offer on the following basis:

"It is our understanding that there is now approximately $8500.00 against the boat and that you intend turning over to Captain Pierce [claimant] a boat worth $2500.00, which will raise the total obligation to about $11,000.00. Captain Pierce is to convey the 'Tahoma' to you. The boat will then proceed to work itself out of debt and pay us fifty per cent of the earnings, after the insurance, upkeep and operating expenses are deducted."

G. W. Nickerson replied to this letter on June 17, 1933, stating in part as follows: "This company's debt against the debtor must remain in exactly the same status as it is now, as foreigners cannot have an ownership interest in an American vessel. Possibly we will allow the register to stay as it is, as there would be nothing that Captain Pierce could do, if he wished. Your mortgage and our bills are sufficient lien on the ship. We will, however, have a Bill of Sale signed in blank, so that it could be used instantaneously if so desired."

Appellee called G. W. Nickerson as its witness, and he testified that a captain usually receives 10 per cent. over and above the share of the fisherman on halibut boats.

The American Consul assigned to Prince Rupert testified on behalf of appellee that Johnson went to the Consulate stating that he had the opportunity of being made master of the Tahoma.

The consul recorded a conversation had with Johnson on July 20, 1933. This record is in part:

"He [Johnson] admitted that his experience as a halibut fisherman, as indicated below, is not sufficient to warrant his being employed as the master of a halibut fishing vessel the size of the 'Tahoma' and that his American citizenship was the reason for his employment;—that Anton (Tony) Martinsen * * * is really in charge of the 'Tahoma' during the fishing operations.

"When inquiry was made as to who employed him while at first he intimated that W. Pierce, appearing as owner of the 'Tahoma' on the register thereof, employed him as master of the vessel, upon being closely questioned he admitted that he had no dealings with Pierce but that he was employed by Messrs. F. E. Hunt, Limited."

On July 21, 1933, Johnson made a statement to the consul which was typed, and

352

signed by Johnson in the consul's presence. The statement made was as follows:

"That under arrangement with Messrs. F. E. Hunt, Limited, he agreed to act as master of the * * * Tahoma * *;

"That while it is customary for masters of halibut vessels of the size and type of the 'Tahoma' to receive 10 per cent of the boat's share in addition to the share allotted members of the crew, in his case he receives 5 per cent of the boat's share owing to the fact that he is only responsible as a member of the crew and, for entering and clearing the vessel as an American citizen while Anton Martinsen receives 10 per cent of the boat's share as well as the share as a member of the crew owing to the fact that he has actual charge of the operations of the vessel;

"That so far as he has a personal knowledge his transaction is entirely with Messrs. F. E. Hunt, Limited, and not with W. Pierce, who appears on the register of the said vessel as owner thereof;

"That according to his understanding thereof the reason for such arrangement is that he has had insufficient experience as a halibut fisherman to have charge of the operations of a halibut vessel of the size of the 'Tahoma.'"

The consul further testified that after May 29, 1933, the claimant became the master of the Wave.

The deputy collector of customs at Petersburg, Alaska testified on behalf of appellee that when a boat enters American territory from a foreign port, he required, as a part of his duties, an oath as to the ownership and operation of the boat; that on October 10, 1933, he required such a statement from Arthur Johnson, registered master of the Tahoma. This statement, signed by Johnson and also by the United States Commissioner at Petersburg as a witness, was introduced into evidence, and was as follows:

"This is to state that on the 29th day of May, 1933, I was employed by F. E. Hunt, Ltd., * * * to act as master of the * * * Tahoma * * * .

"That I was given to understand that Winnie Pierce [claimant] * * * was the owner of the boat as far as I was concerned in answering questions and signing papers pertaining to the vessel was concerned.

"That from the beginning of my employment, I was given to understand that I was master of the vessel in name only and that I was to be guided in all matters of the vessel by Tony Martinsen (a Canadian Citizen), so far, that, on leaving the dock, I was to turn over the navigation of the vessel to Tony Martinsen, that I would revert to the position of a fisherman, and that I would perform the duties of such a fisherman.

"That I was to be given, and have been given, a regular fisherman's share, plus ten per cent of the 'BOAT SHARE', this ten per cent of the BOAT SHARE to be in payment for my services for acting as master of the vessel, in order that the aforesaid Tony Martinsen would not have to appear at the U. S. Customs House."

There was also introduced into evidence on behalf of appellee, an affidavit made by Johnson before a special agent of the Department of Justice on October 3, 1934. At that time Johnson was in Tucson, Ariz. A part of this affidavit was as follows:

"* * * I had a conversation with him [Mr. Milward Nickerson, Manager of F. E. Hunt, Ltd.] alone at the store in which he told me Mr. Martinson was to be Captain and that I was to act as Master for the purpose of clearing the boat. He said I would receive in addition to a fisherman's share, five per cent of the boat's share.

"* * * We fished for halibut entirely and brought all catches to Prince Rupert and disposed of the fish at the Public market. The check for the fish was made out in my name and I immediately turned it over to Mr. Nickerson, who would pay off the crew in cash. I do not know what he did with the balance of the boat's share after paying Martinson and me.

"At no time did I receive any orders from Mr. Pierce and at no time while I was in command of the boat was Mr. Pierce aboard. All my orders came from Mr. Martinson. Mr. Pierce was not present at any of the times I turned over the checks to Mr. Nickerson and as far as I know never received any part of the boat's share.

"I do not know who owns the Tahoma and I have never discussed the boat's ownership with any person."

On cross-examination, on behalf of appellee, of G. W. Nickerson, called as a witness for appellant, it appeared that the Wave had been transferred to claimant's

brother. Nickerson testified in answer to questions propounded by the court as follows:

"Q. I don't understand yet about the 'Wave.' Was it your intention when the 'Wave' was transferred to Pierce that it should be transferred to him free and clear of all incumbrances? A. Yes, we had in mind giving him the 'Wave'.

"Q. I understood you a while ago, at the time you made the transfer of the 'Wave' to Pierce, that was in consideration of any claims he might have against the 'Tahoma'? A. That is he was agreeable to that. .

"Q. Wasn't that the understanding? A. In relinquishing his equity, by letting someone else operate the boat.

"Q. What was the actual consideration at the time of the transfer? A. The consideration was he would let us operate the 'Tahoma' for the benefit of creditors as agents; if there was an opportunity to sell her legally, why sell her.

"Q. For whose benefit? A. Creditors; if there was anything left he would get it."

While G. W. Nickerson was a witness for appellee, he testified on cross-examination that both American and Canadian boats fishing out of Prince Rupert became indebted in large amounts to his firm, and had "to work it out"; that in order to do so, his firm assumed "sort of management" of the boat; that American stores followed the same procedure. He also testified as follows: "When Winnie Pierce [claimant] came in, I saw him and told him I didn't want his boat * * * This 'Wave' was there, and I could arrange to buy Pete Patterson's equity; * * * I made it very emphatic to Pierce we didn't want to take advantage of the unique situation in order to take the 'Tahoma' away from him * * *."

He further testified as follows:

"Q. In this correspondence with the Atlas Engine Company and the Fishing Vessels Marine Ways in what capacity did you write them, with respect to your own interests and Mr. Pierce's also? A. Yes, and their interests. I thought on account of previous correspondence we had with them they were looking to us to play the game with them, that we were their agents too. I told Mr. Pierce that we didn't want to take the boat, but I said, 'I will write the Atlas Engine Company telling them what you are prepared to do. You are prepared to turn the "Tahoma" over to the creditors, provided you can get a different boat or some other boat to operate and have it charged against the "Tahoma." ' So I carried on this correspondence with the Atlas Engine Company, and they were loath to do anything. I think we bluffed them a little—gave them to understand we had rights we didn't have. Whether it was the bluff or a change of heart, they agreed to our proposition. You will note in one letter—the next to the last—we were prepared to give the same extension they were prepared to give, which would not have been necessary if they were going to take the boat over. In the final letter I didn't think it good business to tell them we were not taking the boat over so I told them it was completed and we would take a blank bill of sale, not necessarily to F. E. Hunt, Ltd.

"Q. At that time, and since you have been in business there, you knew, as a Canadian subject, you could not take title to an American boat? A. Absolutely. I had customers in Seattle if I wanted to camouflage the deal I could have done so. At no time was it in my mind I was going to take the 'Tahoma' from Pierce, or see him lose her. He threw himself on our mercy, and I thought it best to carry on correspondence with the Atlas Engine Company on the assumption that would be done—that they might be more ready to give an extension if they thought Pierce was clear of it already. I didn't tell them I had no intention of taking the 'Tahoma' over, or anyone. * * *"

"Q. Did you ever tell any of these creditors that you would have Pierce convey the boat to you? A. Not to my recollection, but when I used the words 'us' or 'our' I was occupying the position of the representative of all the creditors. I didn't mean F. E. Hunt, Ltd., or myself. I was acting for the creditors * * *."

G. W. Nickerson further testified that he did not take a bill of sale from claimant to the Tahoma; that he did not have any oral arrangement or agreement with claimant by which claimant was to convey the Tahoma, or any interest in it. In answer to a question as to what was meant by the mention of "bill of sale" to the creditors, he testified: "I never intended to take it unless they forced the issue; if I had taken it I would have taken it in the name of someone entitled to receive it. Naturally

I was business man enough not to waive any rights I had; naturally I wouldn't transfer a boat the Canadian Government would not accept or I would have a boat on my hands I couldn't do anything with."

The same witness was called on behalf of appellant and testified that the written statement taken by the deputy collector of customs in Petersburg was correct "in a general way"; that "when the boat went to sea Martinson was the man we looked to to get the fish"; and that "we would not have given Johnson the boat without a competent man with him." He further testified that the condition requiring conveyance of the Tahoma to his firm, which was specified by the two creditors in their letter accepting the "offer" was not complied with. When asked what the arrangement with claimant actually was, the witness testified: "When this thing was first suggested we thought from every angle it was best to get the thing in a position where it could be liquidated by the creditors for their own consideration first, and, if there was anything—for Pierce; accordingly I wrote a letter that way. In that, Hunt was going to take a bill of sale or get an equity in the 'Tahoma' otherwise than as an interest in her earnings, to pay the bills she owed, not her profits. Along that line we were willing to give them the 'Wave' under any consideration." He also testified that since the letters were written, his connection with the boat was that he was "acting as the agent of Pierce and the creditors."

Claimant testified that "there never was any talk about a bill of sale"; that he did not agree to sell the boat, or any part of it to F. E. Hunt, Ltd., or to any one else; that he did not sign a bill of sale, or any paper in blank conveying any interest in the boat; that at the time he was testifying, he owned the boat. On cross-examination he testified that since he had been transferred to the Wave, he overhauled the engine in the Tahoma every winter.

There was also evidence that the only qualifications required by the United States of a person as a master was that of citizenship of the United States; and that Johnson was a citizen of the United States, but that Martinsen was a Canadian citizen.

Appellant contends that the burden of proof did not rest on the claimant. The trial court held the contrary.

A very early statute (46 U.S.C.A. § 328) provides: "All penalties and forfeitures which shall be incurred by virtue of this chapter may be sued for, prosecuted, and recovered as penalties and forfeitures incurred by virtue of the laws relating to the collection of duties, and shall be appropriated in like manner; except when otherwise expressly prescribed."

By the act of June 17, 1930 (19 U.S.C.A. § 1615), it was provided: "In all suits or actions brought for the forfeiture of any vessel * * * seized under the provisions of any law relating to the collection of duties on imports or tonnage, where the property is claimed by any person, the burden of proof shall lie upon such claimant: * * * Provided, That probable cause shall be first shown for the institution of such suit or action, to be judged of by the court."

In The Chiquita (D.C.Cal.) 41 F.(2d) 842, 843, it was held that the latter statute was applicable in a proceeding against a vessel for violation of 46 U.S.C.A. § 325. On appeal, this court assumed that rule to be correct. 44 F.(2d) 302, 304. That rule was followed in U. S. v. Davidson (C.C.A. 1) 50 F.(2d) 517 (cert. den. 284 U.S. 660, 52 S.Ct. 36, 76 L.Ed. 559); Jackman v. U. S. (C.C.A.1) 56 F.(2d) 358; Gaul v. U. S. (C.C.A.1) 62 F.(2d) 559 (cert. den. 288 U.S. 616, 53 S.Ct. 507, 77 L.Ed. 989).

Appellant argues that in The Chiquita, supra, the violation charged was engaging in an unlicensed trade, whereas in the instant case the violation charged is using a certificate of registry to which the vessel was not entitled. However, appellant points out no reason why the statute should not be applicable to both cases, and we perceive none. Statements in The Chiquita (C.C.A.5) 19 F.(2d) 417, 418, and in The Winnie (D.C.Pa.) 58 F.(2d) 653, 655, indicate a contrary rule; but we are bound to follow the prior rule approved by this court.

Appellant contends that the evidence is insufficient to warrant a forfeiture. It is clear that there was probable cause for the forfeiture, as examination of the written evidence will disclose. Appellee, having shown probable cause, did not then have the burden of proof, but the burden was on appellant. The trial court found that such burden "has not been sustained by" the claimant, on the ground that claimant's evidence was "both unsatisfactory and unconvincing"; that both witnesses

for claimant "were halting, evasive and generally unsatisfactory witnesses." Under such circumstances, the following from The Ernest H. Meyer (C.C.A.9) 84 F.(2d) 496, 501, is applicable: "Where all of the evidence is heard by the trial judge and the question is one of credibility of witnesses on conflicting testimony, the presumption [of correctness of the trial court's holding] has very great weight."

The written evidence together with the evidence that Johnson and Martinsen operated the Tahoma for F. E. Hunt, Ltd., the evidence of control and management is evidence of a sale or transfer "by way of trust, confidence or otherwise." The explanation apparent from evidence introduced on behalf of appellant, if believed, would be amply sufficient to show that there was no such sale or transfer. As we view the evidence, we must also consider the presumption that appellee's evidence is the correct version of what happened, and we must further consider that appellant's evidence was held incredible by the trial court. Under such circumstances, we are unable to say that appellant has sustained the burden of proof cast upon him.

The following question was propounded to the claimant on direct examination: "Did you obtain permission or consent of the Treasury Department at Washington to the manner in which you were operating the boat and fishing with her?" Objection of appellee was sustained. An offer was then made of a letter addressed to claimant, dated August 29, 1933, signed by Assistant General Counsel, Bureau of Customs, Treasury Department. The material part of the letter was as follows:

"The Bureau is in receipt of your letter of July 29, 1933, in regard to the operation of the gas ship TAHOMA as an American fishery.

"The Bureau after careful consideration of the matter, perceives no objection to the Consul issuing free entry documents for the fish taken by the TAHOMA at the present time."

Appellant contends that this letter was admissible because it shows that the United States sanctioned the operation of the Tahoma, and because it shows claimant's interest in the operation of the vessel.

In Wilber Nat. Bank v. U. S., 294 U.S. 120, 123, 55 S.Ct. 362, 364, 79 L.Ed. 798, it is said: "Undoubtedly, the general rule is that the United States are neither bound nor estopped by the acts of their officers and agents in entering into an agreement or arrangement to do or cause to be done what the law does not sanction or permit."

The letter was inadmissible as showing the sanction of the United States to the method of operation of the vessel. With regard to the second ground named, it could be classified as no more than a self-serving declaration and was inadmissible.

Affirmed.